**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TAYLOR INDUSTRIAL CONSTRUCTION,          )
INC., a Florida corporation,                         )
                                                              )
                                                              )
                    Plaintiff,                              )          Case No.: 8:16-cv-2960-T-24MAP
v.                                                            )
                                                              )
WESTFIELD INSURANCE                            )
COMPANY, an Ohio corporation,              )
                                                              )
                                                              )
                                                              )
                    Defendant.                          )
                                                              )
_____)
                                                              )
SLONE ASSOCIATES, INC.                        )
a Georgia Corporation,                              )
                                                              )
          Counter-Plaintiff,                          )
                                                              )
v.                                                            )
                                                              )
TAYLOR INDUSTRIAL CONSTRUCTION,          )
INC., a Florida corporation                        )
                                                              )
          Counter-Defendant.                        )
_____)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

       Plaintiff and Counter-Defendant, TAYLOR INDUSTRIAL CONSTRUCTION, INC.

("Taylor"), by and through its undersigned counsel, files its Memorandum of Law in Opposition

to the Motion for [Partial] Summary Judgment (Doc. 86) ("Motion") as filed by Defendant,

WESTFIELD INSURANCE COMPANY ("Westfield").

       **I.   Introduction.**   This case originates from a dispute over payment for welding

reinforcement of steel roof joists in a Walmart distribution center ("Project").  To collect payments

due, Taylor filed this action and seeks to collect on a claim of lien against a lien transfer bond from Westfield pursuant to Chapter 713, Florida Statutes.

**II.  Additional Time for Discovery.**

On September 17, 2018, Taylor requested in writing to Westfield and Slone dates for depositions of four individuals: William Slone, Justin Slone, Jason Klug, Chad Pennington, and Bill Daniels, the President of DANIELS WELDING SERVICES, INC. ("Daniels"), the subcontractor that entered the written subsubcontract Agreement ("Contract") with Taylor. Multiple follow up requests were made as well. However, Westfield and Slone failed to reasonably coordinate the depositions. Only Daniels' deposition was scheduled; and it had to be rescheduled to mid-November due to damage caused by Hurricane Michael.  All other requested depositions are just being notice for November.  These witnesses have information material to this response.

Also, on Septembr 17, 2018, Taylor served requests for production of records on Westfield.[1]  Responsive records were due from Westfield on October 17, 2018.  However, as of the date of this filing, Westfield has produced no records and provided no response.  All that Westfield has advised is that records should be produced by the end of this week (after this response is filed).

Opposing counsel has Under Federal Rule of Civil Procedure 56, the Court may defer the motion for summary judgment and allow time to take discovery, or issue any other appropriate order.  Fed. R. Civ. P. 56(d)1.  Taylor made an application for additional time to complete discovery on October 19, 2018. (Doc. 89). Oral argument is set for October 30, 2018.

**III.  Standard of Review.**  The trial court's review of a motion for summary judgment is under Federal Rule of Civil Procedure 56, which provides in relevant part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[1] A copy of the request is attached hereto as **Exhibit B**. Deposition transcripts reference herein are at (Doc. 88).

the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). "Material" facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

Only if the moving party can meet this burden, then the nonmoving party has the duty "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). To foreclose summary judgment when a material fact issue is raised, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). When considering a motion for summary judgment, the court resolves all ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted); *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010). Summary judgment is only proper if no reasonable jury could rule for the non-moving party. *Anderson*, 477 U.S. at 250.

**IV. Summary of Argument.** Westfield's Motion for partial summary judgment invalidly mischaracterizes irrelevant allegations in an attempt to challenge the validity of the lien under which Taylor simply seeks to be paid for its construction work.

In opposition to Westfield's Motion, Taylor has filed the Declaration of Greg Taylor, the President of Taylor ("Declaration"), a true and correct copy of which is attached hereto as **Exhibit**

**A**.  In his Declaration, Mr. Taylor contradicts misrepresentations made by Westfield in its Motion, and adds explanations which raise many disputed issues of material facts.

The lien was not made "willfully exaggerated," "grossly negligent" or "fraudulent" by Taylor's inclusion of insubstantial amounts of time spent completing second passes over welds on its invoices to Daniels.  That is a normal and reasonable part of the process of welding steel in the construction industry, as shown in the Declaration of Greg Taylor.

The express terms of Taylor's Contract with Daniels was based upon hourly rates for Taylor's workers.  Those hourly rates reasonably accounted for all of Taylor's expenses, including insurance, benefits, travel and meal expenses, overhead and profit.  Daniels agreed to pay those rates, and Taylor's lien based upon those contracted rates is legally valid.

It is also normal and reasonable for hourly time charges to include water breaks for the workers to stay hydrated in the hot working conditions of this Project.  Such breaks are required by law and by common sense safety standards.

A typographical error in the lien for a date does not prejudice Westfield.  There is no dispute that the lien was recorded timely within 90 days of Taylor's last work on the Project.  It is also undisputed that the actual amount claimed in Taylor's lien is the total amount of its invoices to Daniels.  Taylor reasonably relied upon its attorney to prepare the lien and thereafter properly signed the lien under oath before a notary public.

Westfield's Motion is deficient in many respects.  Westfield failed to submit sufficient summary judgment evidence to prove that Taylor's welding work was defective.

**V.  Material Facts.**

**a.  Taylor was retained to complete Suwannee's incomplete and insufficient work.**

Taylor was hired by Daniels to replace a prior subsubcontractor, Suwanee Iron Works ("Suwannee"), that Daniels terminated for poor performance.  Some of the welding had been done

previously by Suwanee, and they had done shoddy welding work.  (G. Taylor Dep. 7:13-9:9).

Taylor was directed to repair some of the welding work performed by Suwanee.  (*Id*. at 11:18-23).

On July 8, 2016, Taylor and Daniels reduced their Contract to writing. (Doc. 1-4)[2].

Pursuant to that Contract, Taylor was paid on a time and material basis:

> The Subcontract Work shall be completed on a time and material basis.  The Subcontract Amount shall be calculated based on the labor and material fate sheet attached hereto as Exhibit "A"

On June 25-27, and July 2-4, 9-11, 16-18, 23-26 of 2016, Taylor provided welding services on the Project.  Daniels agreed to Taylor's hours spent on the work when Bill Daniels or his authorized representative signed Taylor's timesheets.  (G. Taylor Dep. 39:10-40:7).

Taylor was only permitted to work on the project during the weekends.  (G. Taylor Decl. ¶¶ 6, 11).  Work was restricted to beginning at approximately 5:00 p.m. and continued all night until the next morning. (*Id.*).  Some of Taylor's welds on the Project were not complete because Walmart made the workers move before they were finished in an area.  (G. Taylor Dep. 111:24-112:12).  An inspector inspected Taylor's welding work and said it was fine.  (*Id*. 113:11-20).  After Taylor fired one welder who had worked on the Project, Taylor's workers completed welds he had worked on.  (*Id*. 111:15-23).  There were "only a spot or two" where a weld was redone. (D. McHaney Dep. 104:5-19).

Westfield misrepresents some deposition testimony in its Motion.  (Motion p. 10). Westfield alleges that Mr. McHaney "admitted to a variety of other issues with the work that had to be corrected."  However, Mr. McHaney actually testified that Taylor was directed by Daniels to change the method of some welds rather than "correct" them.  (D. McHaney Dep. 110:4-10).

---

[2] The written Agreement and Change Order are hereinafter referred to as the "Contract."  The Contract must be applied retroactively.  *Don Facciobene, Inc. v. Hough Roofing, Inc.*, 225 So. 3d 323, 327 (Fla. 5th DCA 2017).

Westfield admitted that the amount of time spent repairing any welds is unknown.  (Motion p. 10).

When the invoices submitted by Taylor to Daniels remained unpaid, Taylor contacted its attorney, advised him of the situation, and provided the attorney with copies of Taylor's invoices and all other documents requested by the attorney.  The attorney drafted a lien and provided it to Taylor for execution. (G. Taylor Decl. ¶ 22) (G. Taylor Dep. 102:4-103:11).  Mr. Taylor relied on his attorney completely to accurately and properly prepare the lien. (G. Taylor Decl. ¶ 23).

The lien and the representations in it are not fraudulent, willfully exaggerated, or overstated in any way. (G. Taylor Decl. ¶ 24).  Apparently the attorney made a typographical error when he wrote that Taylor's last day on the Project was August 26, 2016, since Taylor's last day on the Project, other than to remove equipment and supplies, was actually July 26, 2016, which is what it appears the attorney intended to type.  When Greg Taylor signed the lien on behalf of Taylor, he did not catch that typo.  In any event, the typo caused no prejudice to any party, and absolutely did not serve to inflate the unpaid amount of Taylor's lien. (*Id.* ¶ 25).  Mr. Taylor has only a high school education, and has been working in construction welding for approximately 47 years since he was 18 years old.  (G. Taylor Dep. 5:24-6:9).  Greg Taylor does not have any legal training or college education, but he did review the lien as best he could before he signed it in the presence of the notary public.  (G. Taylor Decl. ¶¶ 26, 27).

The time-and-materials billing of Taylor on the Project has been mischaracterized by Westfield.  This type of Contract is commonly used in the construction industry.  The flat rates for labor and percentage mark-ups for materials costs are all inclusive for Taylor; that is, they include payments to third parties, out-of-pocket costs, payments owed to Taylor's employees, taxes, lodging and meal expenses for out of town work sites, other expenses, and any amounts remaining are profits to Taylor. (G. Taylor Decl. ¶ 28).  All of this is properly charged pursuant to the terms of the Contract negotiated with Daniels. (*Id.*).  It is very common in the construction industry for

a percentage mark-up to be charged for the costs of materials, rentals, and other out-of-pocket costs. (G. Taylor Dep. 47:14-48:6).

Taylor did not make any improper charges for its work on the Project. During its work on the Project, Taylor's welders had to complete their welding on raised lifts that put them close to the rafters in the roof of a warehouse owned by Walmart. (G. Taylor Decl. ¶ 29). In the middle of July in Florida, the heat at the top of the warehouse was intense, especially when Taylor's employees were operating welding torches. This heat induced extreme fatigue and dehydration. Working in these unusually hot conditions, and at night when visibility can be poor, can reasonably cause even experienced, well-qualified welders to need to make more than one pass over the joists they are welding before they are completed. It is also not unusual for the welders to need to take water breaks for safety purposes to avoid injury. (*Id.* ¶ 30). This was true throughout the time Taylor's employees worked on the Project. It was unavoidable given the site conditions. It is also customary, proper, and fully contemplated under the Contract between Daniels and Taylor that this work and time be fully compensated for. This was further understood by Bill Daniels, and reaffirmed by him when he or a Daniels' representative signed Taylor's time sheets and signified Daniels' agreement that the charges were correct under the Contract. (*Id.* ¶ 31). Customary welding practices, under those physically challenging site conditions, necessarily account for the welders to make more than one pass over their work to complete the welds to the standards for the Project. (*Id.* ¶¶ 30, 32). An additional complication on this Project was created by Walmart's requirement that Taylor's welders frequently move from bar joist to bar joist before the welding work on a particular joist was finished. The warehouse remained under use by Walmart throughout the construction. That resulted in Taylor's welders being moved away from bar joists that were not completed. (D. McHaney Dep. 93:12-95:2). The owner created complications were not within Taylor's control, and together with Taylor's inability to return to the job to finish its work, it was

impossible for Taylor to complete the welding work on all bar joists. (G. Taylor Decl. ¶ 32) (D. McHaney Dep. 93:12-95:2). It was appropriate for Taylor to Bill Daniels for times when workers took water breaks because it is necessary for the workers to stay hydrated for safety reasons. (G. Taylor Dep.115:22-118:12) (D. McHaney Dep. 75:1-76:11; 78:10-15) (detailing extreme heat, smoke in the roof, and welders quitting due to heat). All such time was approved by Daniels under the Contract. (G. Taylor Dec. ¶11).

In late July 2016, Daniels notified Slone of its intent to discontinue working on the Project. Shortly thereafter, Taylor received a similar notice from Daniels. Taylor responded in writing informing Daniels that it had not received written notice of default under the Contract, that no defects in Taylor's work had been made known to Taylor, and that unless termination was properly made under the express terms of the Contract that Taylor intended to continue to perform. (G. Taylor Decl. ¶ 17). Taylor then contacted Slone and asked to be kept on the Project, but Slone informed Taylor that it had already hired another welding company to complete the work, Champco from Texas. (*Id*. ¶ 18). As a result of Daniels' decision to cease work on the Project, and Slone's notice to Taylor that Champco had been hired to complete the remaining welding work, Taylor left the Project. (*Id*. ¶ 19).

When Taylor was on the Project and thereafter, it remained willing, ready, and able to fix any deficiencies in its work that were made known to Taylor. (G. Taylor Decl. ¶ 21). No such notice was received, however. (*Id*.). Nor was Taylor given a chance by Daniels, Slone, or Walmart to remedy any alleged deficiencies in its work. (*Id*.). Before it filed its lien, Taylor never received any written notice from Daniels, or Slone, or Walmart, of any deficiencies in Taylor's welding work. (G. Taylor Dep. 130:13-20). Slone thus deprived Taylor, and Daniels, of a contractually

guaranteed opportunity to finalize the welding work it had started.  (G. Taylor Decl. ¶ 16).

**b. Contractual right to written notice of defective work and opportunity to cure.**

Taylor's Contract provided that if any defects or deficiencies were identified in its work,

that Taylor would be provided *written notice* of the issue and afforded seven (7) business days to

make corrections:

> 11.1 FAILURE OF PERFORMANCE  *Should Subsubcontractor fail to satisfy contractual deficiencies or to commence and continue satisfactory correction of the default with diligence or promptness within seven (7) business Days from receipt of Subcontractor's written notice, then Subcontractor, without prejudice to any right or remedies, shall have the right to take whatever steps it deems necessary to correct deficiencies and charge the cost thereof to Subsubcontractor,* who shall be liable for such payment, including reasonable overhead, profit and attorneys' fees. In the event of an emergency affecting safety of persons or property, Subcontractor may proceed as above without notice, but Subcontractor shall give Subsubcontractor notice promptly after the fact as a precondition of cost recovery.
> …
> 11.3. TERMINATION BY SUBCONTRACTOR *If Subsubcontractor fails to commence and satisfactorily continue correction of a default within seven (7) business Days after written notification issued under section 11.1, then Subcontractor may, in lieu of or in addition to section 11.1, issue a second written notification, to Subsubcontractor. Such notice shall state that if Subsubcontactor fails to commence and continue correction of a default within seven (7) Days of the written notification, the Agreement will be deemed terminated.*  A written notice of termination shall be issued by Subcontractor to Subsubcontractor at the time Subsubcontractor is terminated. …

(Contract at pp. 4-5) (emphasis added) (G. Taylor Decl. ¶ 15).

Importantly, Daniels' subcontract agreement with Slone also contained a guarantee of

notice and right to cure.  The Subcontract Agreement required that Slone provide "written notice,"

"a period of 24 hours" to cure, and applied to the discovery of faulty workmanship "at any time"

and without regard to "whether or not such is due to the fault of Subcontractor":

> The following additional terms shall apply to performance by the Subcontractor and the Contractor.
> ….
> (h) *If at any time, in the opinion of the Contractor, the labor or materials or any other item which Subcontractor is obligated to furnish hereunder is deemed insufficient or inadequate, whether or not such is due to the fault of Subcontractor, either in quantity or quality,* to properly prosecute the work

with promptness and diligence, including but not limited to, labor difficulties which impede the progress of the work; or, Subcontractor shall fail at any time to comply strictly with the terms of this agreement or any change order issued as herein provided, *and such insufficiency, inadequacy or failure shall continue for a period of 24 hours of written notice thereof is given by Contractor to Subcontractor,* then Contractor may, at its option and without notice: supply the necessary labor, materials or other items and be entitled to reimbursement from Subcontractor for the cost thereof;…

(Subcontract Agreement 16-002-02 at §3(h)) (Doc. 28-1, p. 5) (emphasis added) (G. Taylor Decl. ¶ 15). Yet, as stated above, Slone did not provide such notice to Daniels or Taylor.

It was not until November 22, 2016 that Slone sent Daniels a notice of defects in its work, which was after Taylor filed this lawsuit. (Doc. 28-3). Neither Slone nor Daniels sent that notice to Taylor.

**VI. Argument.** With its Motion, Westfield failed to submit sufficient summary judgment evidence to prove that any of the welding work performed by Taylor was defective. The inspection report and Walmart letter are not verified. (Motion p. 4). The record shows that some welding was done by a different welder before Taylor began working on the Project, and the unverified inspection report does not differentiate who performed any particular weld. (*Id*.). Therefore, Westfield has not submitted summary judgment evidence to prove that all of the allegedly deficient welding work was performed by Taylor. In the unverified inspection report, most of the comments refer to welds being "incomplete." Taylor was removed from the Project before its scope of work was complete. (G. Taylor Decl. ¶¶ 19, 21, 33). Although Westfield filed copies of certain deposition transcripts, it failed to file with the Court any of the exhibits to those depositions.

**a. Florida Construction Lien Law.** "Chapter 713 of the Florida Statutes, entitled 'Construction Lien Law,' establishes a statutory framework for establishment and enforcement of construction liens by subcontractors, laborers and materialmen." *Trump Endeavor 12 LLC v. Fernich, Inc.*, 216 So. 3d 704, 707 (Fla. 3d DCA 2017). "[T]he fundamental purpose of the Construction Lien Law is to protect those who have provided labor and materials for the

improvement of real property." *WMS Constr., Inc. v. Palm Springs Mile Assoc., Ltd.,* 762 So. 2d 973, 974–75 (Fla. 3d DCA 2000). "It is to be construed favorably so as to give laborers and suppliers the greatest protection compatible with justice and equity." *Id.* at 975. "The mechanics lien law was enacted to protect the interests of subcontractors and materialmen who remain unpaid while the owner pays the contractor directly." *Trump*, 216 So. 3d at 708.

The plain terms of section 713.06 states that a subsubcontractor, like Taylor, is entitled to payment under the terms of its Contract from Westfield as the surety on the lien transfer bond:

> **713.06    Liens of persons not in privity; proper payments.—**
> (1)    A materialman or laborer, either of whom is not in privity with the owner, or a subcontractor or *sub-subcontractor* who complies with the provisions of this part and is subject to the limitations thereof, *has a lien on the real property improved for any money that is owed to him or her for labor, services, or materials furnished in accordance with his or her contract* and with the direct contract *and for any unpaid finance charges due under the lienor's contract*....The total amount of all liens allowed under this part for furnishing labor, services, or material covered by any certain direct contract must not exceed the amount of the contract price fixed by the direct contract except as provided in subsection (3). No person may have a lien under this section except those lienors specified in it, as their designations are defined in s. 713.01.

§713.06, Fla. Stat.  (emphasis added).  This is consistent with the chief purpose of Florida's Construction Lien law – to protect a contractor's right to the benefit of his bargain.

Florida's Construction Lien Law permits the transfer of liens to bonds.  As stated in section 713.24, "(1) Any lien claimed under this part may be transferred, by any person having an interest in the real property upon which the lien is imposed or the contract under which the lien is claimed…"  In the case at bar Slone transferred Taylor's lien to Westfield's bond.

**b. Taylor's lien against the bond is not fraudulent.** Taylor's lien was not made "willfully exaggerated," "grossly negligent" or "fraudulent" by Taylor's inclusion of insubstantial amounts of time spent completing second passes over bar joists welds on its invoices to Daniels.  That is a

normal and reasonable part of the process of welding steel in the construction industry, as shown in the Declaration of Greg Taylor.  It was also approved by Daniels.  (G. Taylor Decl. ¶¶ 30, 32).

Section 713.31(2), Florida Statutes, governs claims and defenses for allegedly fraudulent liens.  The statute states, in pertinent part:

> (2)(a) Any lien asserted under this part in which the lienor has *willfully exaggerated* the amount for which such lien is claimed…or in which the lienor has compiled his or her claim with such *willful* and *gross negligence* as to amount to a willful exaggeration shall be deemed a fraudulent lien.
>
> (b)   It is a complete defense to any action to enforce a lien under this part, or against any lien in any action in which the validity of the lien is an issue, that the lien is a fraudulent lien; and the court so finding is empowered to and shall declare the lien unenforceable, and the lienor thereupon forfeits his or her right to any lien on the property upon which he or she sought to impress such fraudulent lien. *However, a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due does not constitute a willful exaggeration that operates to defeat an otherwise valid lien.*

§713.31, Fla. Stat. (emphasis added).  The emphasis of the statute is clearly that only willful exaggerations of a lien—and explicitly not good faith disputes as to the amount due—can support a defense or counterclaim asserted under section 713.31.

"A claim of lien that overstates the amount claimed is not necessarily fraudulent, unless the exaggeration is made willfully."  *Iberia Bank v. Coconut 41, LLC,* 984 F.Supp.2d 1283, 1302 (M.D. Fla. 2013) (quoting *Sam Rodgers Props.,* 61 So. 3d at 440).  "A mistake in the computation of the amount of the lien is not necessarily a willful exaggeration, and a trial court which reduces the amount of a lien does not necessarily find a willful exaggeration." *Id.* (citing *Politano v. GPA Const. Grp.,* 9 So. 3d 15 (Fla. 3d DCA 2008)).

The case of *Delta Painting, Inc. v. Baumann*, 710 So. 2d 663 (Fla. 3d DCA 1998), cited by Westfield, in inapposite to the facts of this case.  In *Delta Painting*, the lienor included in its lien amounts for work and materials which were not provided ($12,000 of a $21,000 lien).  However,

in this case, there is no allegation that Taylor invoiced any work or materials not actually provided.

Here, there is no dispute that the amount of Taylor's lien claim is the exact amount invoiced by Taylor in good faith under the terms of its Contract with Daniels.  The amount of Taylor's lien does not include any amounts which are not recoverable under its Contract.  Here, the amount of Taylor's lien was calculated pursuant to its Contract on a time-and-materials basis.  The time was calculated by the hours worked by each of Taylor's employees, multiplied by their hourly rate reflected on the schedule attached to the subsubcontract.  The hours worked by each employee are also accounted for on time sheets that are attached to Greg Taylor's Declaration.  (G. Taylor Decl. ¶ 11).  The material costs are the costs charged to Taylor plus a contractual percentage mark-up, as stated in Mr. Taylor's Declaration.  (*Id*. ¶¶ 7, 13, 28).  After the amount charged for the time spent by Taylor's employees is added to the costs charged for materials supplied by Taylor to the Project, the amount of the lien is determined.  It is not inaccurate.  Even if it were, it is certainly not willfully exaggerated under the meaning of section 713.31.

Westfield argues that because one of Taylor's welders was fired by Taylor that the entire lien is fraudulent, if Taylor charged for that welder's work. (Motion p. 10).  At the same time, Westfield admits that "the exact amount of time or expense incurred for such repair work remains unknown." (*Id*).  The time, if any, could have been immaterial.  The expense to Daniels could have been none.  Westfield does not establish these facts, and improperly asks this Court to draw assume facts and inferences against Taylor.  This void of proof is sufficient to deny summary judgment.

Moreover, Westfield's mischaracterizes the terms of Taylor's contract.  Westfield states: "Amounts for that work [by the one welder Taylor let go] are not collectable under the terms of the contract between Daniels and Taylor which provides that Taylor shall be paid for work that is 'satisfactory' and complete." (Ex. 1 to Pl's Compl.).  No section of the Contract is cited.  The un-cited section appears to be from a term included in the Contract before it was amended that set a

lump sum for Taylor's work:

> 2. SUBCONTRACT AMOUNT.  Subcontractor agrees to pay Subsubcontractor $194,400.00 for satisfactory and timely performance and completion of Subsubcontract Work:

(Contract, §2, p. 1).  Because of the challenges on the Project, that payment term was modified to a time-and-material basis.  (G. Taylor Decl. ¶ 7).  Taylor's lien was calculated based on the time-and-materials expended by Taylor prior to Daniels leaving the job.  Not the provision cited by Westfield, which was amended.  Notwithstanding this fact, Daniels approved the hours worked and the invoices provided by Taylor, and Taylor may in good faith rely upon that approval to lien for those invoice amounts. (*Id*. ¶¶ 7, 14).  Taylor also had a contractual right of notice and an opportunity to repair any defects in its work, which was not honored. *Underwater Engineering Services, Inc. v. Utility Board of Key West*, 194 So.3d 437, 446 (Fla. 3d DCA 2016) (reversing judgment for the city and remanding with instructions to enter final judgment for contractor due to failure to provide notice and a chance to cure); *Magnum Construction Management Corp. v. City of Miami Beach*, 209 So.3d 51, 55 (Fla. 3d DCA 2016) (reversing judgment holding contractor liable for defects in the work where notice and chance to cure not provided).

**c.  Overhead and profit may be included in a lien.**  The express terms of Taylor's Contract with Daniels was based upon hourly rates for Taylor's workers.  Those hourly rates reasonably included all of Taylor's charges for their work, including insurance, benefits, travel and meal expenses, overhead and profit.  (G. Taylor Decl. ¶¶ 7, 28).  Daniels agreed to pay those rates, and Taylor's lien based upon those rates is legally valid.

Inclusion of profit and overhead and profit in the amount of a lien does not necessarily render it fraudulent.   "This is not to say that overhead and profit as part of the reasonable value of the work performed may not be included in the lien. Section 713.08(1)(c), Fla. Stat. says that the calculation of the amount of the lien begins with the reasonable value of the work performed or

the contract price."   Florida Construction Law Manual, 2016-2017 Edition, by Larry R. Leiby, Section 8:81 on page 760.

The Fourth District Court of Appeal has allowed overhead and profit to be included in a lien, and stated directly and succinctly:

> In estimating the reasonable value of work and labor actually furnished (where the contract has been terminated without fault of the materialman or contractor) such factors as the actual cost of work done and materials supplied, including the overhead and profit, wages paid to employees performing the labor supervision and rentals of equipment furnished in the improvement, may be considered. 53 Am. Jur. 2d Mechanics' Liens §§ 103-107, 245; *see also Rebisso, Inc. v. Frick*, 1953, 159 Ohio St. 449, 112 N.E. 2d 651; *cf. Surf Properties v. Markowitz Bros.*, Fla.1954, 75 So. 2d 298.

> Such items, as Separate items, are nonlienable but become lienable when they are included in a contract price or reflected in the reasonable value of labor or materials furnished.

*Haney Chevrolet, Inc. v. Poli Bros.*, 262 So. 2d 230, 231 (Fla. 4th DCA 1972).  This is the applicable interpretation of the provisions of the Florida Construction Lien Law on that issue.

The lien statute addresses the matter more tangentially.  As the Court of Appeal for the Fifth District observed, albeit in dicta: "We also note that section 713.05 states that a contractor is permitted to have a lien on real property for money that is owed 'for labor, services, materials, or other items required by, or furnished in accordance with the direct contract.' " *Onionskin, Inc. v. DeCiccio*, 720 So. 2d 257, 258 (Fla. 5th DCA 1998) (quotation omitted).  The same court later explained the *Onionskin* and a prior decision with regard to overhead and profit in liens:

> The court in *Onionskin* cited *Stevens v. Site Developers, Inc.*, 584 So. 2d 1064, 1065 (Fla. 5th DCA 1991), where this court affirmed a finding that a lien was not

willfully exaggerated even though it included claims for breach of contract damages and lost profits. The *Onionskin* court explained that

> the pivotal difference between this case and Stevens, is that in Stevens, the trial court found the lien imposed, while including improper items, was, nonetheless, filed in good faith.

*Medellin v. MLA Consulting, Inc.*, 69 So. 3d 372, 375 (Fla. 5th DCA 2011). These decisions all dealt with facts under which overhead and profit were not included in the express terms of the written contract. Here, the Contract between Daniels and Taylor included overhead and profit in the agreed hourly rates.

The First District Court of Appeal explained other provisions of the statute:

> "A contractor . . . who complies with the provisions of the Florida Mechanics' Liens Law, Chapter 713, Fla. Stat., has a lien on the improved real property for any money that is owed to him for labor, services, materials, or other items required by, or furnished in accordance with, the direct contract. Section 713.05, Fla. Stat. (1981). The "direct contract" is the agreement between owner and any other person for improving real property. Section 713.01, Fla. Stat. (1981). Under subsection 713.01(3) "contract price" is

> > the amount agreed upon by the contracting parties for performing all labor and services and furnishing all materials covered by their contract and shall be increased or diminished by the price of extras or change orders as herein defined, or by any amounts attributable to changes in the scope of the work or defects in workmanship or materials or any other breaches of the contract ...

*Hobbs Const. & Dev., Inc. v. Presbyterian Homes of Synod of Fla.*, 440 So. 2d 673, 673–74 (Fla. 1st DCA 1983). The *Hobbs* court ruled that lien was fraudulent, however, that was because the lien amount was in significant excess of the guaranteed maximum price under the written contract.

The Third District Court of Appeal has also addressed the matter in a minority opinion:

> Similarly, cases holding that a materialman's overhead and profit are lienable provided these items are included in the contract price or are reflected in the reasonable value of materials furnished, *see Haney Chevrolet, Inc. v. Poli Bros., Inc.*, 262 So. 2d 230, 231 (Fla. 4th DCA 1972); accord, *Surf Properties, Inc. v. Markowitz Bros.*, 75 So. 2d 298 (Fla.1954); *Broderick v. Overhead Door Co.*, 117 So. 2d 240, although distinguishable on the ground that the materialman's earnings,

unlike the laborer's, depend on the inclusion of these items, cannot be said to be totally inapposite.

*Sprinkler Fitters & Apprentices Local Union No. 821, U.A. v. F.I.T.R. Serv. Corp.*, 461 So. 2d 144, 151 n.5 (Fla. 3d DCA 1984) (Pearson, J., concurring in part; dissenting in part).

When a contractor is in privity with the owner, the value of their contract determines the amount of the lien. In other words, the amount owed it is not the reasonable value of the contractor's work but the price stated in the contract. *Ins. Co. of North America v. Julien P. Benjamin Equipment Co.*, 481 So. 2d 511, 513 (Fla. 1st DCA 1985) (holding that lien of a contractor in privity with owner determines the amount of the lien; "When the owner does so contract, the contract price, not the reasonable value is the measure of the supplier's recovery.").

As for parties not in privity with the owner, such as Taylor in this case, the values stated in their contracts likewise determine the amount of liens. *C.f. 14th & Heinberg, LLC v. Terhaar and Cronley General Contractors, Inc.*, 43 So. 3d 877 (Fla. 1st DCA 2010) ("When a true contract exists, the parties' rights are fixed by law and by the terms of the contract. However, when an implied or quasi-contract is involved, liability is determined by principles of equity and justice and the intent of the parties is immaterial."). One case in particular is instructive on this point. In *Royal v. Clemons*, 394 So. 2d 155 (Fla. 4th DCA 1981), the appellee supplied fill dirt pursuant to a contract with the general contractor. *Id.* at 156. The contract was not for a flat rate; rather it was based on the amount of materials provided. *Id.* When the appellee was not paid he filed a lien, which was subsequently bonded off. *Id.* at 157. The trial court valued the lien based on the amount of the appellee's contract. The appellate court affirmed noting the trial court appropriately used the appellee's contract with the general contractor to value the surety's liability under the bond:

> With regard to the latter issue, based on conflicting evidence the trial court found that the parties intended the contract price would be determined by a final measurement of the fill which appellee hauled from the borrow pit. Appellants' second point on appeal challenges these findings; there is, however, substantial

competent evidence in the record to support that finding and thus we must accept it.

*Id.* Here, the value of Taylor's work performed under its subsubcontract with Daniels establishes the value of Taylor's claim against the lien transfer bond. This of course is consistent with the text of section 713.06(1): "…a subcontractor or sub-subcontractor who complies with the provisions of this part and is subject to the limitations thereof, has a lien on the real property improved for any money that is owed to him or her for labor, services, or materials furnished in accordance with his or her contract…" It is also consistent with the purpose of Florida's lien law to protect a subcontractor like Taylor by securing rights to payment bargained for in its contract.

It is normal and reasonable for hourly time charges to include water breaks for the workers to stay hydrated in the hot working conditions of this Project. Such breaks are required by law and by common sense safety standards. (G. Taylor Decl. ¶ 30).

It was not improper for Taylor to include overhead and profit, among many other costs, such as lodging and meals, in its hourly rates, which were expressly agreed to by Daniels.

Therefore, the Court should deny Westfield's Motion for partial summary judgment because the amount of Taylor's lien against Westfield is properly the amount stated on the face of the lien, $175,453.36 (plus reasonable attorneys' fees and costs to be determined at a later date), based upon the terms of Taylor's written contract with Daniels.

**d. A lienor may rely on his attorney's preparation of the lien.** A typographical error in the lien for a date does not prejudice Westfield especially when the typo was made by the lienor's attorney. There is no dispute that the lien was recorded timely within 90 days of Taylor's last work on the Project. It is also undisputed that the actual amount claimed in Taylor's lien is the total amount of its invoices to Daniels. (G. Taylor Decl. ¶¶ 14, 24). Taylor reasonably relied

18

upon its attorney to prepare the lien and thereafter properly signed the lien under oath before a notary public. (*Id*. ¶¶ 23, 27).

Because a fraudulent lien has to be willfully fraudulent, where a lienor consulted counsel and had a plausible basis for the amount of the lien, the question of whether any exaggeration was fraudulent is an issue of fact that precludes summary judgment. *E.g. J..W. Rolle Development Corp. v. Neuman*, 910 So. 2d 349 (Fla. 4th DCA 2005).

The Second District Court of Appeal has addressed this issue directly in *Sharrard v. Ligon*, 892 So. 2d 1092, 1097 (Fla. 2d DCA 2004) (abrogated by statute on other grounds):

> Pursuant to section 713.31(2)(a), a claim of lien that overstates the amount claimed is not fraudulent unless the exaggeration was made "willfully." *See Vinci Dev. Co. v. Connell*, 509 So. 2d 1128, 1132 (Fla. 2d DCA 1987); *Scott v. Rolling Hills Place, Inc.*, 688 So. 2d 937, 939 (Fla. 5th DCA 1996). A lienor's consultation with counsel prior to filing a claim of lien tends to establish that the lienor acted in good faith. Therefore, in determining whether a lienor has willfully exaggerated the amount stated to be due in a claim of lien, the lienor's consultation with independent counsel prior to filing the claim of lien is a factor to be considered along with other pertinent factors. *See William Dorsky Assocs., Inc. v. Highlands County Title & Guar. Land Co.*, 528 So. 2d 411, 412 (Fla. 2d DCA 1988); *Stevens v. Site Developers, Inc.*, 584 So. 2d 1064, 1065 (Fla. 5th DCA 1991).

*Id.* The District Court for the Middle District of Florida has wholly adopted this view. *See Iberia Bank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1302 (M. D. Fla. 2013), aff'd, 589 F. App'x 479 (11th Cir. 2014).

The Second District Court of Appeal had earlier reversed a trial court's determination that a lien filed by an architect was fraudulent, finding that relying on legal counsel to prepare the lien (along with having argued an alternative basis for entitlement to the total liened amount) "strongly militate against [the] contention that the lien was fraudulent." *William Dorsky Assocs., Inc. v. Highlands Cty. Title & Guar. Land Co.*, 528 So. 2d 411, 412 (Fla. 2d DCA 1988). At issue in the case was whether the project had been terminated after schematic design or design development.

The lienor had decided the latter, and his attorney determined he had reached that conclusion in good faith.  The court in that case opined:

> The attorney calculated the amount which could be asserted on [lienor's] behalf and prepared and filed a claim of lien accordingly. In analyzing whether [lienor] willfully exaggerated the amount, we cannot overlook the fact that [lienor] filed its claim after consultation with independent counsel.

*Id.*  Similarly, the Fifth District Court of Appeal affirmed a trial court's determination that a lien was not fraudulent solely on this basis. *Stevens v. Site Developers, Inc.*, 584 So. 2d 1064, 1064 (Fla. 5th DCA 1991).  The issue in that case was "whether a claim of a mechanic's lien is fraudulent merely because the amount judicially determined to be correct is substantially less than the amount of the lien claimed."  The court explained its ruling:

> The trial judge still has discretion in determining the intent and good or bad faith of the lienor when he stated the amount of the lien claimed. The seeking of advice of counsel, prior to the preparation and filing of the lien, as the appellee did in this case, is evidence relevant to that inquiry. We cannot hold as a matter of law that the trial judge abused his discretion in making the necessary finding of fact in this case.

*Stevens v. Site Developers, Inc.*, 584 So. 2d 1064, 1065 (Fla. 5th DCA 1991) (citation omitted).  Finally, the lien's statement that "…[the contract] of a total value of approximately $194,400.00, of which remains unpaid $175,453.36…" can only be reasonably interpreted to mean that the amount of the lien is $175.453.36, and is not an exaggeration of the amount claimed.  In fact it is merely a file-in-the-blank statutory format in Section 713.08(3), Florida Statute.

Therefore, because Taylor reasonably relied upon its attorney for the preparation of its lien, and because the typographical error for a date is irrelevant and non-prejudicial, Westfield's Motion should be denied.

**VII.   Conclusion.**   WHEREFORE, Plaintiff and Counter Defendant, TAYLOR INDUSTRIAL CONSTRUCTION, INC., this Honorable Court enter an Order denying the Motion for Summary Judgment (Doc. 86) filed by Defendant, WESTFIELD INSURANCE COMPANY,

along with all further relief the Court deems just.

Dated: October 25, 2018.

Respectfully submitted,

/s/ Michael A. Sasso
MICHAEL C. SASSO, Trial Counsel
Florida Bar No. 368415
notice@sasso-law.com
msasso@sasso-law.com
kdevore@sasso-law.com
MICHAEL A. SASSO
Florida Bar No. 93814
masasso@sasso-law.com
SASSO & SASSO, P.A.
1031 West Morse Blvd., Suite 120
Winter Park, Florida 32789
Tel.: (407) 644-7161
Attorneys for Taylor Industrial Construction, Inc.

## CERTIFICATE OF SERVICE

I, Michael A. Sasso, certify that a true and correct copy of the foregoing has been filed

and served on counsel for all parties via the Court's CM/ECF system on October 25, 2018.

/s/ Michael A. Sasso
Michael A. Sasso