UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| TAYLOR INDUSTRIAL CONSTRUCTION, INC., a Florida corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 8:16-cv-2960-SPF |
| v. | ) ) | |
| WESTFIELD INSURANCE COMPANY, an Ohio corporation, | ) ) ) | **DISPOSITIVE MOTION** |
| Defendant. | ) ) | |
| _____ | ) ) | |
| SLONE ASSOCIATES, INC. a Georgia Corporation, | ) ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) | |
| TAYLOR INDUSTRIAL CONSTRUCTION, INC., a Florida corporation, | ) ) ) | |
| Counter-Defendant. | ) ) | |
| _____ | ) | |

**TAYLOR'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, TAYLOR INDUSTRIAL CONSTRUCTION, INC. ("Plaintiff" or "Taylor"),

through undersigned counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 3.1, files this motion

for final summary judgment or, in the alternative, partial summary judgment, against Defendant,

WESTFIELD INSURANCE COMPANY ("Westfield").

**I. Introduction**

Taylor provided over 2,600 hours of labor welding on a project located in Brooksville,

Florida, during the summer of 2016.  As compensation for its work, Taylor has been paid

nothing.  Moreover, despite a contractual right to notice and a chance to cure deficiencies, Taylor

1

received no notice of alleged deficiencies in its work, and Slone Associates, Inc. ("Slone"), the general contractor, destroyed all evidence of the purported deficiencies without giving Taylor a chance to inspect.  Now Taylor seeks payment under the Florida lien law against a bond.

## II.  Statement of Material Facts

a.  <u>Taylor is hired by Daniels to finish Suwannee's incomplete and insufficient work</u>

On or before June 25, 2016, Taylor entered into a "handshake" agreement with Daniels Welding, Inc. ("Daniels"), subcontractor to Slone, to provide welding on a project owned by Wal-Mart ("Owner"). (Depo. Daniels, 79:11-18; 85:10-16).  They welded on the weekends; each shift was twelve hours starting at 5:00 p.m. and ending at 5:00 a.m. (*Id.*, 36:10-17).

Slone Associates, Inc. ("Slone") is the general contractor that hired Daniels.  Daniels obtained Slone's consent to hire Taylor. (*Id.*, at 82:1-3; 98:23-99:17) (describing that it obtained Slone's approval for the Taylor contracts); (Depo. J. Slone, 46:18-47-25; 50:25-51:20) (discussing calls and e-mails about Taylor's prices in Exs. 2 and 3).  Daniels "never made a move on this job" about hiring without discussing it with Slone. (Depo. Daniels, 99:10-17).

Taylor replaced a prior welding sub-subcontractor, Suwanee Iron Works ("Suwanee"), that Daniels terminated for poor performance. (*Id.*, 56:25-58:5, 81:6-15); (Depo J. Slone, 23:1-13).  Slone gave approval to fire Suwanee. (Depo Daniels, 81:16-25).

On June 25-27, 2016, Taylor began welding on the Project. (*Id.*, 85:17-22). During that time Taylor's invoices reflect 576 hours on the project. (Depo. Daniels, Exs. 18, 27).

On June 29, 2016, Taylor sent Daniels a written flat rate contract, (*Id.*, Ex. 2, Daniels000021-27), but before returning to work Taylor advised it could only continue on a time-and-materials basis. (*Id.* at 86:1-20).  On June 30, 2016 Taylor sent Daniels a time-and-

materials Change Order, which Daniels signed. (*Id.*, Ex. 2, Daniels000028-32) (e-mails between Taylor and Daniels providing Change Order).

On July 2-4, 2016, Taylor recommenced welding.  Daniels signed and approved Taylors' time for this weekend, which was 502 hours. (*Id.*, Ex. 18.).

On July 7, 2016, Daniels received Taylor's first invoice for work on June 25-27 and July 2-4. (*Id.*, Ex. 2, Daniels-00036-37). Daniels signed and approved all of Taylor's time for July 2-4, (*id.*, Ex. 18), but due to an apparent administrative oversight Taylor did not ask Daniels to sign time records for June 25-27 (most likely because the contract converted to time-and-materials on July 1). (*Id.*, 109:11-22). The total owed under the invoice is $64,740.00. (*Id.*).

Also on July 7, Slone and Daniels entered into a written subcontract agreement. (Depo. J. Slone, Ex. 5).  The contract amount was $555,769.00. (Depo. J. Slonc, Ex. 5, Tay00437).

On July 8, 2016, Taylor sent Daniels a second Change Order and Contract, which superseded the others. (Depo. Daniels, Ex. 2, Daniels-000039-48) (e-mail dated July 8, 2016, from Daniels to Slone attaching Taylor's new Change Order and Contract).  Daniels executed the Change Order and Contract on July 8, 2016. (Doc. 1-4); (Depo. Daniels, Ex.16, pp. 1-10).  Under the Contract, the cost for Taylor's men would be $60/hour, and materials would be charged at cost-plus according to the scale on the term sheet. (*Id.*).

Slone, as the general contractor, had dominion and control over Daniels and had authority to approve Daniels' contract with Taylor. William Slone questioned whether Taylor's $60/hour included time to eat and take breaks – but did not object to said charges. (Depo. J. Slone, 46:24-47:25, and Ex. 2) (e-mail from William Slone raising these questions).

On July 9-11, 2016, Taylor once again welded on the Project. Daniels signed and approved all of Taylor's time for July 9-11, which was 539.5 hours. (Depo. Daniels, Ex. 19).

On July 16-18, 2016, Taylor furnished laborers to the Project. Daniels signed and approved all of Taylor's time for July 16-18, which was 539 hours. (*Id.*).

Also, on July 17, 2016, the Owner's inspector from ATC, Raul Mafla, performed his only inspection while Taylor was on-site. (Depo. Daniels, 148:6-12). By then Taylor performed over 1,600 hours of work. The inspector indicated to Taylor's supervisor, Dwayne McHaney, that: "Inspector says no problem with joists. Passed 1st inspection." (Depo. McHaney, Ex. 3, p.1) (McHaney Daily Log, 7/17/16). Slone's representative also received notice that there were only a few "minor redos". (Depo. W. Slone, Ex. 28, Tay00127). ATC then drafted a report noting *no* defects and that work was ongoing. (Depo Daniels, Ex. 25, Tay00003).

After the weekend of July 16-18, Daniels asked Taylor to consider leaving the job for financial reasons. (*Id.*, 122:21-123:6). Around this time, Bill Daniels attempted to hire Taylor's welders on the Project to finish the work directly for Daniels, and discussed this directly with Mr. McHaney. (*Id.*, 160:8-161:3). In other words, Daniels attempted to cut Taylor out. On July 20, 2016, Taylor sent Daniels a letter declining to leave the job, and emphasized that as required by its contract no written notice of the default had to be provided. (Depo Daniels, Ex. 22). Daniels never provided Taylor notice of a default – and instead Slone and Daniels agreed to have Taylor return the next weekend. (*Id.*, 131:6-10) (describing how Slone and Daniels agreed to "allow him [Taylor] to come back [on the Project] one more time.").

On July 23-25, 2016, Taylor furnished men to the Project. Daniels signed and approved all of Taylor's time for July 23-24, and for some unknown reason did not for July 25, (*Id.*, 116:11-18); the total time was 524 hours. (*See id.*).

Bill Daniels was on the job every day supervising Taylor's work. (Depo. Daniels, 149:19-25). The sole exception is when he would occasionally leave early to get some rest.

4

On July 25, 2016, Bill Daniels left the job and drove to meet Greg Taylor to discuss the job in person. (*Id.*, 133:4-1; 123:7-22). At the meeting Bill Daniels promised to pay Taylor for all of Taylor's work thus far and in exchange asked Taylor to leave the job. (*Id.* at 126:4-16). Daniels discussed paying Taylor with Slone before assuring payment. (*Id.* at 125:19-23). No mention was made of poor quality of work by Taylor, objections to Taylor's hours, the qualifications of Taylor's men, or Taylor's invoices. (*Id.*). Taylor agreed to consider Daniel's request if put in writing. (Depo. Taylor, 87:3-24).

On July 26, 2016, Daniels received Taylor's invoice for the weekends of July 9-11, 2016 for 539.5 hours of labor, and July 16-18, 2016 for 539 hours of labor. (Depo. Daniels, Ex. 2, Daniels-000051-57). Daniels signed and approved all of Taylor's time for these dates. (*Id.*, Ex.19). The total owed under the invoice is $64,710.00. (*Id.*).

On July 27, 2016, Daniels advised Slone it was leaving "because my money on the job isn't going to be adequate to complete the project." (*Id.*, Ex. 23) (e-mail from Daniels to Slone enclosing default letter); (Depo. J. Slone, 34:24-35:24) (describing Daniels financial problems).

After Daniel's defaulted, Greg Taylor called William Slone and offered to continue to work. "Q: (Mr. Sasso) What did you and Greg discuss [after Daniels defaulted]? A: Greg told me that he would stay on the job at the $60 an hour per person. Q: Okay. What else did he say? A: Well, I – it was not a long conversation because I told him no." (Depo. W. Slone, 27:17-22). When asked why Slone declined, William Slone said it was "[m]ainly the production rate," (*id.* at 27:23-28:4), and that Taylor's workers were taking breaks "fairly regular" to go outside. (*Id.* at 28:5-14). (Depo. Taylor, 132:24-133:5) (confirming Taylor's offer).[1]

---

[1] William Slone acknowledged if Taylor's welders were overheating the correct safety protocol would be to take them down off of the lifts, and to go outside where it is cool to drink water. (Depo. W. Slone, 69:14-70:21).

On August 11, 2016, Taylor sent Daniels its invoice for the weekend of July 23-26 for 525 hours of labor, and $11,531.88 of equipment and $887.56 of expendables. (Depo. Daniels, Ex. 2, Daniels-00057-66). Daniels signed and approved all of Taylor's time for July 23-24, (*id.*, Ex. 20), but due to administrative oversight did not sign for July 25. (*Id.*, 116:11-18). The total owed under the invoice is $43,919.44. (*Id.*).

On August 12, 2016, Taylor sent Daniels its invoice for equipment. (*Id.*, Ex. 2, Daniels-00067-70). The total owed for the invoice is $2,083.92. (*Id.*).

On August 15, 2016, Taylor e-mailed Slone its invoices. (Depo. J. Slone, 82:21-83:11).

After Slone and Daniels received Taylor's invoices, neither advised Taylor of an objection to its charges. (*Id.*, 83:6-17); (Depo. Daniels, 119:6-14; 119:23-120:12). Furthermore, after reviewing the invoices, Daniels confirmed that the materials stated were all provided to the job. (*Id.*, 117:1-19, 118:10-23). Objections were only made after Taylor initiated this case.

On August 18, 2016, Taylor signed the lien drafted by its counsel. (Depo. Taylor, 128:12-129:18, Ex. 17). On August 22, 2016, Taylor filed its lien. (Doc. 1-6). The face amount of the lien is the sum of Taylor's four (4) invoices on the project: $175,453.36. When the lien was recorded none of Taylor's charges were objected to by Slone, Daniels, or anyone else.

On September 26, 2016, Slone bonded off Taylor's lien at the request of the Owner; the surety is Westfield. (Doc. 1-8). The amount of the bond was calculated based off of $175,453.36 for a total amount of $253.234.20. (Depo. W. Slone, 41:6-11). The bonding agent assisted, (*id.* at 41:6-15), and the Hernando County staff told Slone the amount of the bond. (*Id.* at 43:5-13).

Slone decided to use a different subcontractor, Champco, to complete the welding. Champco finished all welding in September of 2016. (Depo. J. Slone, 70:14-19).

On November 10, 2016, Slone certified to the Owner in its pay application: "I also certify that the contractor has paid all amounts previously billed and paid by the owner." (Slone 0025).[2] This is not true. All of Taylor's invoices Slone received on August 15 are unpaid.

On November 24, 2016, for the first time, Slone sent Daniels written notice of alleged deficiencies in the welding work. (Depo. Daniels, 141:2-7, Ex. 24). After this case was filed, Taylor learned for the first time that its work was allegedly insufficient – but when Taylor requested the chance to inspect, it was denied access on the basis that no evidence remained. Justin Slone acknowledged this fact (Depo. J. Slone, 75:5-16; Exs. 7 and 8), and so has the Owner, stating: "it would be virtually impossible to reproduce the conditions or situation or that occurred during the time Taylor was at the site." (*Id.*) (quoting Ex. 8, SLON0097).

Slone never asked Daniels to repair alleged welding deficiencies in the August 24 ATC report. (Depo. Daniels, 140:18-141:12). Also, Slone is fully paid by the Owner for the joist reinforcement work, (Depo. J. Slone, 62:22-24), despite paying Daniels only $62,500.00. (*Id.*, 97:15-23; Ex. 18). Slone contends that Taylor is owed nothing. (Depo. W. Slone, 73:23-74:11). When asked what Taylor might be owed, Slone responded: "It would be either negative or zero." (*Id.* at 74: 11). To date, Taylor has still been paid nothing.

## III.    Standard of Review on Summary Judgment

A motion for summary judgment should be granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317,

---

[2] Attached hereto as **Exhibit 1**.

327 (1986) (citation omitted).  "The moving party bears the initial burden to show the district

court, by reference to materials on file, that there are no genuine issues of material fact that

should be decided at trial.  Only when that burden has been met does the burden shift to the non-

moving party to demonstrate that there is indeed a material issue of fact that precludes summary

judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

## IV.   Argument – Taylor is Entitled to Judgment on the amount of its lien

### a.   Florida lien law protects unpaid subcontractors

"Chapter 713 of the Florida Statutes, entitled 'Construction Lien Law,' establishes a

statutory framework for establishment and enforcement of construction liens by subcontractors,

laborers and materialmen." *Trump Endeavor 12 LLC v. Fernich, Inc.*, 216 So. 3d 704, 707 (Fla.

3d DCA 2017) "[T]he fundamental purpose of the Construction Lien Law is to protect those who

have provided labor and materials for the improvement of real property." *WMS Constr., Inc. v.*

*Palm Springs Mile Assoc., Ltd.,* 762 So. 2d 973, 974–75 (Fla. 3d DCA 2000).  "It is to be

construed favorably so as to give laborers and suppliers the greatest protection compatible with

justice and equity." *Id.* at 975.

Section 713.06, states that subcontractors are entitled to lien for their contract amounts:

**713.06   Liens of persons not in privity; proper payments.**—
(1)   A…sub-subcontractor who complies with the provisions of this part and is
subject to the limitations thereof, *has a lien on the real property improved for any*
*money that is owed to him or her for labor, services, or materials furnished in*
*accordance with his or her contract* and with the direct contract *and for any*
*unpaid finance charges due under the lienor's contract…* (3)…

§ 713.06, Fla. Stat.  (emphasis added).  "A contractor is entitled to a lien based upon the

compensation he is due according to the express terms of the contract between the contractor and

owner." *Vinci Dev. Co. v. Connell*, 509 So. 2d 1128, 1132 (Fla. 2d DCA 1987). "A large part of

a contractor's duties under a direct contract with an owner is to perform services, and a contractor

8

is entitled to be compensated fully according to the contract method of compensation regardless of whether the compensation is for work performed, material furnished or services rendered." *Id.*; *Ins. Co. of N. Am. v. Julien P. Benjamin Equip. Co.*, 481 So. 2d 511, 513 (Fla. 1st DCA 1985) (same); *Royal v. Clemons*, 394 So. 2d 155 (Fla. 4th DCA 1981) (same).

  b. <u>Computation of Taylor's lien according to its Subcontract with Daniels</u>

  Over the sum of the four invoices provided by Taylor, 2,682.5 hours of labor are reflected.[3] At no time prior to the filing of the lien, or this case, were Taylor's invoices or hours on the job objected to by any party – including Slone, Westfield, or Daniels. *Supra* at 6. In fact, in their depositions, Slone and Daniels confirmed Taylor's representations of the number of men and hours on the project is accurate. (Depo. W. Slone, 82:6-83:1); (Depo. Daniels, 121:9-25).

  Taylor has carefully analyzed the amounts of labor charged under its lien. It appears that 14 hours of the 2,668.5 hours that appear on Taylor's invoices might be reasonably disputable. Those 14 hours constitute 00.521 % of the hours claimed under Taylor's lien.

  On June 26, it appears that sixteen, instead of fifteen, laborers may have been counted for Taylor's hours for June 25-27 resulting in the inclusion of twelve extra hours. This may have been caused by human error in misreading the handwriting in the one row on that date's timesheet where a handwritten zero appears instead of a twelve. A mere mathematical error in adding up the numbers, typographical error, or similar mistake to which people are prone is also possible. Notably, Daniels never objected to the inclusion of all 576 hours for the weekend of June 25-27, despite having this invoice on July 7, 2016, and later promised Greg Taylor that he would pay it during his in-person meeting on July 25, 2016. *Supra* at 5.

  On July 2-4, 503 hours instead of 502 hours were included on Taylor's invoice. *Supra* at

---

[3] Taylor spent many other hours on the job in excess of what was invoiced, as reflected by its records. (Depo McHaney, Comp. Ex. 6) (reflecting time spent by Taylor on work related to the project during the entire week).

3. The 502 hours were signed and approved by Daniels. *Id.* Similarly, on July 23-25, 525 hours instead of 524 hours were included on Taylor's invoice. *Supra* at 4. In other words, one extra hour may have been inadvertently included on July 2-4 and July 23-25, because on July 2 and July 23 one of Taylor's workers billed one hour less than all the others. As a result, the most likely explanation for the extra hour is a minor mathematical error.

For purposes of resolving this matter, Taylor will not claim these 14 hours, and will subtract them from the total 2,682.5 hours claimed under its lien. Taylor's is now claiming only 2,668.5 hours for labor on the Project. At $60 per hour the total for labor is $160,110.00.

As for materials, the invoices issued on August 11 and 12 are supported by receipts for items all covered under Taylor's contract with Daniels. *Supra* at 6. There is one minor exception, however. On the August 11th Invoice there is a charge from Sunbelt for $10,406.88. (Depo. Daniels, Ex. 20). The discrepancy is $272.37. Two diesel generators were charged for a total of $3,602.14 at 15% contractual markup is $4,142.46. Electric welders for a total of $5,447.32 at 10% contractual markup is $5,992.05. That adds up to $10,134.51. However, $10,406.88 is handwritten on Taylor's time sheet. (Depo. Daniels, Ex. 2, Daniels-000059). It was also unobjected to at all times prior to the filing of this case, and there is no dispute that it was used on the job. (Depo Daniels, 116:19-117:20). To avoid a dispute over a minor sum, and to resolve this matter on summary judgment, Taylor will into reduce its lien by the $272.37.

Applying these write offs of labor and materials Taylor's lien of $175,453.36 is now $174,340.99. A summary of those hours is displayed on the chart attached hereto as **Exhibit 2**.

As a matter of law, these minor reductions, even if errors, do not invalidate the lien. §713.31(b), Fla. Stat. (acknowledging that minor mistakes and errors do not invalidate a lien); *see also* §§ 713.08(3), (4)(a), Fla. Stat. (omissions or errors in the discretion of the court do not

10

invalidate a lien).  Case law is instructive on the application of these statutes.

The Court may reduce a lien without invalidating it.  In a bankruptcy proceeding in the Southern District of Florida, a court made substantial modifications to a lien before finding it valid. *In re Cummings,* No. 98-36372-BKC-SHF, 2000 WL 33310906, at *1 (Bankr. S.D. Fla. Sept. 15, 2000). There, the contractor and homeowner agreed that the contractor would perform services on a time and material basis at an hourly rate with a 15% contractor's fee. *Id.* The contractor ultimately filed a lien in the amount of $43,540.93, which the homeowner argued was fraudulent and unenforceable as being willfully exaggerated because it encompassed services that the contractor had not performed. *Id.* at *2. In analyzing the claim, the court developed a table of seven items it deemed improperly included in the lien, for reasons ranging from "Charge unwarranted" to "billing for this item is excessive." *Id.* at *3. The court determined "[t]he aggregate amount of the afore-described charges, which the court deems excessive or unwarranted, is $2,320.53." The court reduced the lien: "Plaintiff's allowed claim, after deducting the afore-described items, equals $41,220.40." *Id.* Other courts have similarly reduced or approved the reduction of lien amounts but enforced the lien. *IberiaBank v. Coconut 41, LLC,* 984 F. Supp. 2d 1283, 1302 (M.D. Fla. 2013), *aff'd,* 589 F. App'x 479 (11th Cir. 2014) ("[A] trial court which reduces the amount of a lien does not necessarily find a willful exaggeration."); *Gator Boring & Trenching, Inc. v. Westra Constr. Corp.,* 210 So. 3d 175, 183 (Fla. 2d DCA 2016) ("Moreover, simply because a court reduces the amount of a lien does not render the lien fraudulent."); *Politano v. GPA Constr. Grp.,* 9 So. 3d 15, 16 (Fla. 3d DCA 2008) ("The court made reductions in the lien, concluding that there had been a legitimate dispute over some items, and there were other items which had been included in error . . . [w]e see no abuse of discretion in the trial court's determination . . . that the lien was not fraudulent.").

Section 713.31(2), Florida Statutes, governs fraudulent liens.  The statute states:

(2)(a) Any lien asserted under this part in which the lienor has *willfully exaggerated* the amount for which such lien is claimed…or in which the lienor has compiled his or her claim with such *willful* and *gross negligence* as to amount to a willful exaggeration shall be deemed a fraudulent lien.

(b)   It is a complete defense to any action to enforce a lien under this part, or against any lien in any action in which the validity of the lien is an issue, that the lien is a fraudulent lien;…*However, a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due does not constitute a willful exaggeration that operates to defeat an otherwise valid lien.*

§ 713.31, Fla. Stat. (emphasis added).  "[A] dispute between the parties as to the amount of compensation due according to the contract plan of compensation or even a dispute as to the method of compensation provided in the contract does not convert such a good faith dispute into a fraudulent lien as provided in Section 713.31." *Vinci Dev. Co.*, 509 So. 2d at 1132.  The emphasis is clearly that only willful exaggerations—and explicitly not good faith disputes, or minor errors—can support a defense or counterclaim under Section 713.31, Florida Statutes.

This Court's holdings are in accord with this premise.  "A claim of lien that overstates the amount claimed is not necessarily fraudulent, unless the exaggeration is made willfully." *IberiaBank*, 984 F. Supp. 2d at 1302 (quoting *Sam Rodgers Props., Inc. v. Chmura*, 61 So. 3d 432, 440 (Fla. 2d DCA 2011)).  "A mistake in the computation of the amount of the lien is not necessarily a willful exaggeration, and a trial court which reduces the amount of a lien does not necessarily find a willful exaggeration." *Id.*

Taylor's lien is certainly not willfully exaggerated under the meaning of Section 713.31, Florida Statutes.  As the *Cummings* court determined, after deducting $2,320.53 from that contractor's otherwise valid $43,540.93 lien, "a minor mistake or error in the claim of lien" does not render it fraudulent. 2000 WL 33310906, at *4 (quoting §713.31(2)(b)).

Similarly, in another case where a contractor believed all contracted-for work had been

completed, a Florida court has affirmed a trial court's reduction of the lien while holding the lien

was not fraudulent.  *See Zupnik Haverland, L.L.C. v. Current Builders of Fla., Inc.*, 7 So. 3d

1132, 1135 (Fla. 4th DCA 2009).  In that case, the contractor filed a $540,000 lien against a

project for fully complete work.  *Id.* at 1133.  Later, when the owner disputed completion, an

engineer determined $13,891 in work remained outstanding for "latent defects and building code

violations."  *Id.* at 1134.  The appellate court affirmed finding a good faith dispute where, "the

undisputed testimony reflects that the contractor believed in good faith that, at the time it

recorded its lien, it had completed all of the work required under the settlement agreement and,

therefore, was entitled to receive the full amount listed in the lien."  *Id.* at 1134-35.

In yet another case, the appellate court reversed the trial court's ruling that a lien was

fraudulent.  *Sam Rodgers*, 61 So. 3d at 441.  In that case, the contractor included in his lien

reimbursement work and insurance premiums to protect the work after the owner refused to pay.

The court determined that these items not covered by the contract.  *Id.* at 439.  Still, the court

reversed, stating that the inclusion of these small amounts, totaling about $3,500, did not render

the lien fraudulent.  The court opined: "[A]minor mistake or error in a claim of lien, or a good

faith dispute as to the amount due does not constitute a willful exaggeration that operates to

defeat an otherwise valid lien."  *Id.* at 439-40 (quotation omitted).

    c.    <u>Notice of defect and opportunity to cure required by contract</u>

Due to the notice-and-right-to-cure clauses in the Daniels' Subcontract, §3(h), and

Taylor's Sub-subcontract, §11.1, Slone's failure to give Taylor notice of defects and a chance to

cure forecloses Westfield's arguments for deductions from Taylor's invoices for shoddy work.

Florida law enforces contractual rights to notice-and-cure for construction defects.  Two

cases in particular are instructive.  In the *Underwater Eng'g Servs., Inc. v. Utility Bd. of Key*

*West*, 194 So. 3d 437, 446 (Fla. 3d DCA 2016) case, a contractor, Underwater Engineering
Services, Inc., was retained to install structural concrete collars in the Florida Keys pursuant to a
written contract with the Utility Board of Key West. *Id*. at 442-443. A dispute arose over
payment to Underwater by the Utility Board. *Id.* at 442. The Utility Board contended that
Underwater provided shoddy workmanship in a defense and counterclaim. *Id.* Underwater
argued that the Utility Board failed to give Underwater its contractual right to of an opportunity
to cure defective collars, and at trial the court entered judgment against Underwater. *Id.* at 443.
The appellate court reversed judgment on the Utility Board's counterclaim. *Id.* at 445-46. The
court observed that, "[t]he uncontested evidence at trial established that the Utility Board did not
give Underwater the opportunity to '[r]eplace the [w]ork, or portions of the [w]ork, not
conforming to specified requirements.'" *Id.* at 446. Another instructive case is *Magnum Constr.
Mgmt. Corp. v. City of Miami Beach*, 209 So. 3d 51, 55 (Fla. 3d DCA 2016). There, the City
awarded a contract to construct a public park to Magnum Construction Management ("MCM").
*Id.* at 53. After the construction was completed, it came to the City's attention that MCM
defectively constructed the park. *Id.* Instead of notifying MCM and providing it a chance to
cure, the City hired a new contractor that replaced MCM's work. *Id.* The City filed suit against
MCM to recover for defective construction, and prevailed after a bench trial. *Id.* MCM
appealed claiming that it cannot be liable for defects because the City "never provided MCM
with an opportunity to cure any of the playground defects, as required by the contract
documents." *Id.* at 54. The appellate court agreed and reversed. *Id.* at 54, 56.

Here, Taylor's sub-subcontract with Daniels entitled it to written notice and seven (7)
days to cure possible defects in its work. (Doc. 1-4, §11.1). Similarly, Daniels' subcontract with
Slone entitled it to written notice and twenty-four (24) hours to cure possible defects. (Depo. J.

14

Slone, Ex. 5, Tay00439, §3(h)).  Slone never gave this notice to Taylor or Daniels. *Supra* at 6-7.

Of equal importance is Slone's rejection of Taylor's request to return to the job to complete unfinished work.  *Id.*; (Taylor Aff. ¶ 21).[4]  At the time, Slone had received and reviewed Taylor's July 8, 2016, Contracts from Daniels, *supra* at 3, and had actual or constructive knowledge of the terms of that agreement.   Including the term entitling Taylor to notice and a chance to cure any default by way of insufficient work.  *Id.*   Instead, Slone made a business decision to hire a replacement contractor and only noticed Daniels of defects *after* the defects it now complains of were mended. *Supra* at 6-7.

Therefore, like the decisions in *Magnum* and *Underwater*, this Court should enter judgment holding that Slone and Westfield, are prohibited by the subcontract and sub-subcontract from asserting that defects in Taylor's work to justify a reduction of its lien.

d.    Slone's spoliation of allegedly deficient welds warrants appropriate sanctions

After Daniels left the job, Slone made a considered decision to not notify Daniels or Taylor of alleged deficiencies in welding.  *Supra* at 6.  This spoliation of evidence has wholly prevented Taylor from adequately investigating allegations it performed shoddy work.

"A district court has 'broad discretion' to impose sanctions as part of its 'inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Oil Equip. Co. Inc. v. Modern Welding Co.*, 661 F. App'x. 646, 652 (11th Cir. 2016).  Factors to consider when confronted with spoliation include the prejudice to the other party, cures for the prejudice, importance of the lost evidence, bad faith, and potential abuse of expert testimony. *Id.* Proper sanctions include dismissal of claims, exclusion of expert testimony, and presumptions against the spoliator. *Id.* at 652-53. *See also Simon Prop. Grp., Inc. v. Lauria*, No. 6:11-cv-

---

[4] Taylor's affidavit is located at (Doc. 93-2), and is attached hereto as **Exhibit 3**.

01598-Orl-31KRS, 2012 WL 6859404, *8 (M.D. Fla. Dec. 13, 2012).

Here, Slone knew that according to its subcontract with Daniels, and Taylor's sub-subcontract, which Slone had, obligated it to provide notice of defective welding and a chance to repair the welds. *Supra.* at 4; (Doc. 1-4, §11.1). This right of inspection is fundamental under Florida Statute 558, which governs construction defect actions.

Instead of honoring Taylor and Daniels' contractual rights to notice-and-cure, Slone directed Champco to complete all of the welding, destroying the evidence of allegedly shoddy work in the process. *Supra* at 7. Slone and the Owner acknowledge that the evidence is gone. *Id.* In fact, when Taylor issued a subpoena to inspect the allegedly deficient welds it was advised an inspection would be futile. *Id.* Moreover, as the successor contactor to Suwannee, Taylor worked extensively in areas where Suwannee had already welded. A fact that is well-established in this case. *E.g.* (Depo. Daniels, 121:15-17). The inspector from ATC could not tell welders apart, and his reports do not reflect what company, Taylor or Suwanee, welded on specific joists or parts of joists. (Depo. Mafla, 207:8-22). Only general locations are indicated. (*Id.* at 153:12-19). Slone's Field Reports and Taylor's logs are no substitute for an inspection; neither tracked locations of deficient work. (Depo. W. Slone, Ex. 28). Although photographs of some joists exist, it is impossible to tell what joists, in what part of the Project were completed by Suwannee or Taylor, or how much time it took to fix a joist. (Depo. McHaney, 100:10-101:6).

Suwannee's work is so bad, that Westfield and Slone's own expert described his experiences with them as "Not good," that their performance was so poor that, "I did not think that we would ever get through the [other] project," and ultimately Suwannee was removed. (Depo. Pennington, 65:23-66:8). Even the ATC inspector identified Suwannee, not Taylor, as welders that "needed more training to do those welds." (Depo. Mafla, 134:1-8).

Westfield cannot even identify basic facts about the defects, such as where the deficient welding performed *by Taylor* is located. (Westfield's Reponses, Interrog. #3, pp. 2-3).[5] There is no competent evidence that Taylor, not Suwannee, performed deficient or incomplete welds. Here, Taylor was deprived of its rights to inspect such evidence for itself.

Therefore, because Slone made the business decision to avoid providing notice to Daniels or Taylor, and deprived them of an inspection before directing Champco to complete and allegedly "fix" those deficient welds, this Court should strike those allegations by Slone and Westfield.  Alternatively, an inference should be granted that none of Taylor's work was shoddy.

## V.    Summary Judgment is warranted on Westfield's Affirmative Defenses[6]

a.    <u>Taylor's lien is not fraudulent, as a matter of law</u>

Westfield's defenses numbered 7 and 13 allege that Taylor's lien is fraudulent. (Doc. 7). From the vague allegations, the gravamen of each defense appears to be defective or deficient work, and failure to complete work under the subcontract by Taylor.  (*Id*.).  Section 731.31 provides that a willfully exaggerated claim of lien is fraudulent and unenforceable, as is discussed herein on pages 12 through 14.  Several reasons warrant entry of summary judgment.

***First***, there is no evidence that Taylor's lien is willfully overstated or compiled in such a way that would constitute gross negligence.  The amount of the lien itself is exactly the amount of the summation of Taylor's four (4) invoices. *Compare* (Doc. 1-5) *to* (Doc. 1-6).

Taylor prepared those invoices after referencing the time sheets for its workers on the Project and the invoices and receipts from vendors that furnished materials.  Taylor's experienced, and trusted superintendent, Dwayne McHaney, had direct knowledge of Taylor's

---

[5] A copy is attached hereto as **Exhibit 4**.  Slone has purported to know in this case, but has never answered the same basic questions other than through vague non-specific references.
[6] Westfield's Tenth Affirmative Defense was struck by this Court. (Doc. 25, p. 4).

work on the project and prepared the time records based on his personal notes of who worked on the project and how long each person worked. (Depo. McHaney, 67:11-69:9). Daniels even signed and approved every one of Taylor's time sheets he was asked to sign. *Supra* at 3-6. Mr. McHaney also had direct knowledge of the equipment, materials, and rentals Taylor furnished to the Project. *Supra* at 4. In consultation with Mr. McHaney, Taylor prepared its four (4) invoices on this project. *Supra* at 3, 5-7.

Prior to filing its lien on August 22, 2016, Taylor provided each of those invoices to Slone and Daniels. *Supra* at 5-6. Neither gave Taylor any indication that the charges were incorrect. *Supra* at 5-7. In fact, Bill Daniels who personal supervised Taylor's work told Greg Taylor in person on July 25, that he would pay Taylor everything he was owed. *Supra* at 5. Greg Taylor then spoke to William Slone about staying on the job after Daniels left. Supra at 5. William Slone had personally been on the Project almost every day Taylor furnished labor and materials. (Depo. W. Slone, 71:3-6). During his conversation with Greg Taylor, William Slone never advised Greg Taylor that Taylor should not be paid for his time or materials furnished to the Project. *Supra* at 6. Even after Taylor e-mailed Slone its invoices on August 15, 2016, Slone never advised Taylor of objections to the amounts in the invoices. *Supra* at 5.

Therefore, on August 22, 2016, when Taylor recorded its lien, it believed in good faith that all four (4) of its invoices contained sums Taylor was owed under its contract with Daniels. *Supra* at 6; (Depo Taylor, 114:3-25) (billed for time on the job, as agreed to). Where a contractor believed, in good faith that, at the time it recorded its lien, it had completed all of the work required under its contract, "it is entitled to receive the full amount listed in the lien." *Zupnik*, 7 So. 3d at 1135. That sums owed under those invoices is exactly the amount stated on

the face of the lien.  Minor errors, like inadvertent inclusion of amounts adding to 0.63% of the

charges in a lien, do not make Taylor's lien fraudulent.

     ***Second***, to assist in the preparation of the lien Taylor sought out and relied upon legal

counsel.  In Florida law, it is well accepted that a contractor that seeks out assistance from

counsel to prepare a lien has acted in good faith.  Because a fraudulent lien has to be willfully

exaggerated, where a lienor consulted counsel and had a plausible basis for the amount of the

lien, the question of whether any exaggeration was fraudulent is an issue of fact that precludes

summary judgment. *J.W. Rolle Dev. Corp. v. Neuman*, 910 So. 2d 349 (Fla. 4th DCA 2005).

     The Second District Court of Appeal has addressed this issue directly in *Sharrard v.*

*Ligon*, 892 So. 2d 1092, 1097 (Fla. 2d DCA 2004) (abrogated by statute on other grounds):

> Pursuant to section 713.31(2)(a), a claim of lien that overstates the amount
> claimed is not fraudulent unless the exaggeration was made "willfully." *See Vinci*
> *Dev. Co. v. Connell*, 509 So. 2d 1128, 1132 (Fla. 2d DCA 1987); *Scott v. Rolling*
> *Hills Place, Inc.*, 688 So. 2d 937, 939 (Fla. 5th DCA 1996). A lienor's
> consultation with counsel prior to filing a claim of lien tends to establish that the
> lienor acted in good faith. Therefore, in determining whether a lienor has willfully
> exaggerated the amount stated to be due in a claim of lien, the lienor's
> consultation with independent counsel prior to filing the claim of lien is a factor to
> be considered along with other pertinent factors.

*Id.* (internal citations omitted).  The Middle District has wholly adopted this view. *See*

*IberiaBank*, 984 F. Supp. 2d at 1302, *aff'd*, 589 F. App'x 479 (11th Cir. 2014).

     Before signing or recording the lien, Taylor spoke to his attorney on the telephone,

obtained legal advice from counsel, shipped his attorney a package of documents pertaining to

the lien, received a draft lien from counsel, and sought follow up advice about recording the lien.

*Supra* at 3-6.  Under such facts there is no bad faith pertaining to the lien.

     The sole exception to Florida's advice of counsel defense applies where the client seeks

to deceive its attorney in some material way that results in an exaggeration of the amount of the

lien. However, there is not even a suggestion that those are the facts of this case, and Greg Taylor has refuted as much in his affidavit. (Taylor Aff. ¶¶ 22-24).

Therefore, Taylor's good faith use of counsel to prepare its lien is conclusive evidence that the Taylor never sought to willfully exaggerate the amount of the lien.

***Third***, alleged deficiencies in Taylor's work on the Project do not support a finding of fraud in the preparation of the lien. This argument by Westfield and Slone is specious. As an initial matter, there is no dispute that purported deficiencies in Taylor's work were unknown prior to the August 24, 2016 ATC report. *Supra* at 4, 7. That report was not created until 2 days after Taylor recorded its lien on August 22, 2016. *Supra* at 7. The only ATC inspection of Taylor's work while Taylor was on-site occurred on July 17, 2016 – and after 1.5 hours of inspection the ATC inspector passed all of Taylor's work "with just a couple of minor 'redos'." (Depo. W. Slone, Ex. 26, Tay00127). The corresponding July 17, 2016 ATC report notes no defects in welding – only that "Work is still in progress." (Depo. Mafla, Ex. 17, Tay0003). Furthermore, none of Slone's Daily Job Reports created while Taylor was on-site note deficiencies in Taylor's welding. (Depo. W. Slone, Ex. 28, Tay00117-00132). Any deficiencies by Taylor would have likewise been noted, just as Suwannee's prior deficiencies were. (Depo. W. Slone, Ex. 28, Tay00111, 00113). Lastly, if Daniels noted insufficient welding, Taylor to made the repair without exception. (Depo. Daniels, 168:16-19).

Westfield cannot claim that Taylor's lien is fraudulent due to purported deficiencies in Taylor's work that neither Slone, Daniels, Taylor, nor the ATC inspector detected *prior* to Taylor recording its lien on August 22, 2016. *Supra* at 6.

Therefore, it is undisputed that when Taylor recorded its lien on August 22, 2016, it had no notice of any deficiencies in its welding work. *Id.* Under Chapter 713, Florida Statutes, disputes over allegedly shoddy work by Taylor will not support a fraudulent lien claim.

***Fourth***, dispute that arose during litigation about the quality of Taylor's workmanship does not render the lien fraudulent. A hotly contested issue is whether Taylor performed shoddy workmanship. Taylor vehemently disputes that it did. Moreover, all of Taylor's welding would have been completed had Daniels not defaulted, or Slone permitted Taylor to finish its work. Further, Taylor's predecessor, Suwanee, was fired for poor workmanship in areas worked on by Taylor. As a matter of law, this "good faith dispute" does not render the lien fraudulent.

Section 713.31(2)(b), expressly recognizes that, "a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due does not constitute willful exaggeration that operates to defeat an otherwise valid lien." An instructive case on this point is *William Dorsky Assocs., Inc. v. Highlands Cnty. Title & Guar. Land Co.*, 528 So.2d 411 (Fla. 2d DCA 1988). There, an architect filed a lien and had a dispute with the owner related to the degree of completion of its work. *Id.* at 412. At trial, the trier of fact determined that the architect had not completed all of the work under the contract that was included in its lien, a finding which was affirmed on appeal. *Id.* As a result, the trial court found the lien fraudulent. *Id.* However, the appellate court reversed, noting that the architect sent an invoice to the owner and consulted with counsel who calculated the amount of the lien. *Id.* Here, before recording its lien, Taylor sent its invoices to Daniels and Slone, received no objection to its charges, and engaged independent counsel to prepare the lien. *Supra* at 3-6. Even if Taylor lost a dispute over the quality of its work, that would not make its lien fraudulent under Section 713.31(2)(b).

Other Florida appellate courts reached similar holdings. In *Vinci Dev. Co.*, 509 So.2d at 1132-33, a dispute existed between an architect and an owner over whether the architect could lien for a "savings bonus" even though the work was not performed. *Id.* at 1132. The appellate court reversed because this good faith dispute over a contract did not render the lien fraudulent. *Id.* In *Scott v. Rolling Hills Place, Inc.*, 688 So. 2d 937 (Fla. 5th DCA 1996), a lienor included amounts in his lien for "the amount he believed remained unpaid for the work performed." *Id.* at 939. The lienor did not complete its work was because it had not been paid. *Id.* However, that dispute over who breached first did not make the lien fraudulent, and the court reversed. *Id.* 939-40. Here, a good faith dispute over whether Taylor is entitled to lien for its hours is not fraud.

Likewise, inclusion of non-lienable items would not necessarily render the lien fraudulent. In the case of *Sam Rodgers*, 61 So. 3d 432, amounts for property insurance ($1,800.91) and property taxes ($1,634.12) were not chargeable under the contract. *Id.* at 439. However, that did not render the lien fraudulent. *Id.* Similarly, here, disputes over minor errors in the calculation of Taylor's invoices do not render the lien willfully exaggerated or fraudulent.

***Fifth***, Westfield's argument that typographical errors, unrelated to the amount of Taylor's lien, render it fraudulent lack merit. Taylor's lien does contain typographical errors in the date of items last furnished, "August" is typed instead of "July", and the inclusion of the former contract amount of $194,400.00, (Doc. 1-6), arguably should have been left blank after the flat rate deal was superseded. (Doc. 1-4). However, those typos do not exaggerate the *amount* of the lien. Second, the typos caused no prejudice. As stated in his deposition, William Slone consulted with Hernando County staff to determine the amount of the bond. (Depo. W. Slone, 42:16-43:11). The county informed Slone of the amount, $175,453.36 (*id.*, Ex. 26, p. 2) ("I finally received the information yesterday on the total bond amount required by Hernando

22

County."), resulting in Slone obtaining a bond based on the correct amount.  The typos were entirely harmless.  Therefore, under Section 713.31 these minor mistakes are not fraudulent.

      b.     <u>Westfield's remaining defenses each fail as a matter of law</u>

     Westfield asserts eleven other defenses. (Doc. 7, pp. 6-9).  All are readily negated.

     The first defense of failure to mitigate is insufficient.  Failure to mitigate is not a recognized defense to a construction lien foreclosure action.  *See* 8 Fla. Prac., Constr. Law Manual §§ 8:71-8:82 (2018-2019 ed.) (omitting this defense).  Moreover, as explained earlier herein, Taylor fully performed under its contract, fixed every allegedly faulty weld known to Taylor, and even offered to return to the project after Daniels left.  *Supra* at 5-7.  Moreover, it is undisputed that Taylor had no knowledge of alleged defects in its welds until after the August 24 ATC report and, even then, Taylor was not permitted to make corrections.  *Supra* at 6-7.  By August 24, all of Taylor's time and materials had been invoiced, and the lien recorded.  *Id.*  There is no evidence whatsoever that Taylor failed to mitigate in providing labor and materials.

     The second defense of contributory and comparative negligence is legally deficient.  Contributory negligence is not a defense in Florida. *Hoffman v. Jones*, 280 So. 2d 431, 438 (Fla. 1973).  Comparative negligence bars a party from recovering that proportion of damages for which he is responsible, *id.* at 436, but this is not a defense to foreclosure of a lien.  Moreover, this defense is negated by the facts demonstrating that Taylor's right to recover under its contract may not be diminished for alleged shoddy welding. *Supra*; (Doc. 1-4, §11.1).  At all times prior to filing its lien, Taylor had no notice of deficiencies in its welds, fixed every known deficiency, had its offer to complete work refused by Slone, and was never provided notice and a chance to cure as it was entitled to under Section 11.1 of its contract with Daniels. *Supra*.  Taylor is not negligent by adhering to the express terms of its contract with Daniels. (Doc. 1-4, §11.1).

The third defense is unclean hands.  The *Cong. Park Office Condos II, LLC v. First-Citizens Bank & Trust Co.* case describes the conduct necessary to establish the defense: "Unscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief."  105 So. 3d 602, 609 (Fla. 4th DCA 2013).  The simple breach of a contract is not.  *Cong. Park*, 105 So. 3d at 609; *Synovus Bank v. Sims*, 540 F. App'x. 905, 907 (11th Cir. 2013) (affirming summary judgment for want of "unrighteous, unconscientious, or oppressive conduct").  Here, an allegation that Taylor was negligent or acted with a "want of due care in performance of the work" is insufficient.  *Cong. Park*, 105 So. 3d at 610.  Providing deficient or incomplete welds (that were not fixed) would, at most, be an ordinary breach. Moreover, Taylor did not breach its contract, but rather performed in all material respects, and never received notice and right to cure of a default—to which it was entitled under Section 11.1 of its contract.  *Supra* at 4; (Doc. 1-4, §11.1).  Thus, summary judgment is warranted.

The fourth, fifth, and eleventh defenses seeks offset based on a purported breach by Taylor of its subcontract with Daniels.  The only description of the breach is in defense eleven stating Taylor "failed to perform or failed to perform properly".  (*Id.* at p. 8).  That breach must be material, not trivial. *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So.3d 955, 960 (Fla. 5th DCA 2015); *MDS (Canada) Inc. v. Rad Source Tech., Inc.*, 720 F.3d 833, 850 (11th Cir. 2013) (breach that causes no harm not material).  The testimony of Bill Daniels negates the breach allegations, as he explained that Taylor fully performed: "…they showed up on the job with a good workforce, you know, and they began their work…Anyway, they worked, and they – they always provided plenty of labor.  They provided me with weld certificates, and they welded, you know.  They done their job.  As far as I was concerned, they was up there working, doing what seem to be the – doing the work right." (Depo. Daniels,

121:13-15, 20-25).  Moreover, every time Daniels asked Taylor to fix a weld it was fixed. (*Id.*, 168:16-19).  Under its contract, Taylor was entitled to written notice of any default and a chance to cure.  (Doc. 1-4, §11.1).  That notice never came. (Depo. Taylor, 130:13-20).  Therefore, under Section 11.1 of Taylor's contract, Taylor never materially breached.

The sixth defense is a mere denial that Taylor suffered damages, which is not a defense. *See also* (Doc. 25, p. 4) (recognizing it as a denial); *Landon v. City of N. Port*, No. 8:15-cv-02272-CEH-JSS, 2016 WL 164633, at *2 (M.D. Fla. Jan. 14, 2016) (defenses must show excuse, justification, or some other negating matter).  Moreover, as stated earlier herein, Taylor's damages are unpaid sums owed for labor and materials. (Taylor Aff. ¶ 22).

The eighth defense seeks offset, recoupment, or other credits for damages suffered by Slone for Taylor's negligence. This is no defense here as Slone did not bring negligence claims against Taylor.  Thus, there can be no offset, recoupment, or "other credits".  Moreover, Slone's single fraudulent lien claim is negated as stated in response to defenses seven and thirteen.

The ninth defense asserts unnamed defenses which have, will, and/or could be raised by Slone.  No defenses have been raised by Slone.  Slone's third party claim is for a fraudulent lien (Doc. 28, pp. 8-9), which is negated for the same reasons as defenses seven and thirteen, the responses to which hereby incorporated.  Any defenses not pled need not be negated.

The twelfth defense alleges Westfield's right to limit Taylor's recovery to the extent Taylor received compensation from other sources. However, Taylor has received no compensation and remains wholly unpaid, as stated above. *Supra* at 7; (Taylor Aff. ¶ 22).

The fourteenth defense asserts offset for prevailing party attorney's fees under Sections 713.29 and 713.31, Florida Statutes.  Offset for fees and costs incurred in an action where the purported defense is pending does not relieve Westfield of liability for the very claims at issue.

## VI. Conclusion

Wherefore, Plaintiff, TAYLOR INDUSTRIAL CONSTRUCTION, INC., is entitled to final summary judgment against Defendant, WESTFIELD INSURANCE COMPANY, holding that the lien is $174,340.99, that the affirmative defenses are insufficient and negated by the facts, that Taylor is entitled interest, an award of its attorney's fees under Sections 627.428, 627.756, 731.29, and 713.31, Florida Statutes, and other legal grounds, costs, expenses, and all other proper relief. Alternatively, the Court should enter partial summary judgment in the event it concludes that disputes of fact or law remain as to other claims or defenses.

Dated: December 28, 2018.          Respectfully submitted,

MICHAEL A. SASSO
Fla. Bar No. 93814
masasso@sasso-law.com
notice@sasso-law.com
wgory@sasso-law.com
SASSO & SASSO, P.A.
1031 West Morse Blvd., Suite 120
Winter Park, Florida 32789
Tel.: (407) 644-7161
*Attorneys for Taylor Industrial Construction, Inc.*

## CERTIFICATE OF SERVICE

I, Michael A. Sasso, certify that a true and correct copy of the foregoing has been filed and served on counsel for all parties via the Court's CM/ECF system this December 28, 2018.

Michael A. Sasso