UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAYLOR INDUSTRIAL CONSTRUCTION, )
INC., a Florida corporation, )
  )
  )
     Plaintiff, ) Case No.: 8:16-cv-2960-SPF
v. )
  )
WESTFIELD INSURANCE )
COMPANY, an Ohio corporation, )
  )
  )
     Defendant. )
_____ )
  )
SLONE ASSOCIATES, INC., )
a Georgia Corporation, )
  )
     Counter-Plaintiff, )
  )
v. )
  )
TAYLOR INDUSTRIAL CONSTRUCTION, )
INC., a Florida corporation, )
  )
     Counter-Defendant. )
_____ )

**TAYLOR'S OMNIBUS REPLY
TO DEFENDANTS' OPPOSITIONS TO SUMMARY JUDGMENT**

Plaintiff and Counter-Defendant, TAYLOR INDUSTRIAL CONSTRUCTION, INC. ("Taylor"), through undersigned counsel, files its omnibus reply to the oppositions to its summary judgment motion filed by Defendant, WESTFIELD INSURANCE COMPANY ("Westfield"), and Counter-Plaintiff, Slone Associates, Inc. ("Slone") (collectively or individually referred to as "Defendant"), that are filed at (Docs. 131, and 132).[1]

---

[1] An omnibus reply is submitted because (Doc. 132) incorporates (Doc. 131). Similarly, citations to authority that appear in both (Docs. 109 and 110) are cited to only once, where a second citation would be redundant.

**I.      Charges for Time-and-Materials in the Lien are Established on Summary Judgment**

The specific hours of labor expended and expenses for material are established by Taylor, with the stipulated write-offs of 14 hours and $272.37 for materials. Taylor presented its detailed time sheets and receipts on summary judgment (*see* Doc. 110, pp. 9-12), and Defendant presents no counter evidence attacking the entries. (Docs. 131, p. 6). Rather, Defendant makes generalized objections to time (Doc. 131, p.2), and a single objection to a charge for a truck. (*Id.*). None of these create a genuine dispute of material fact, however.

      a.      <u>Generalized objections to labor charges are no bar to summary judgment</u>

In this case, Defendant relies almost exclusively on categorical objections to Taylor's labor. These objections are: (1) defective welding was allegedly performed and invoiced, (*e.g.* Doc. 131, pp.10, 15-16); (2) billing time for water, rest, or food breaks is improper, (*id.*, pp. 13-16); (3) the labor rate of $60/hour is not enforceable and includes lodging, (*id.*, p.6); and, (4) Taylor cannot bill for work by a terminated employee. (*Id.*, p. 5). Each is addressed in turn.

**1. Alleged *defective* welding does not prevent enforcement of the lien**

There is no evidence that Taylor provided *defective* welds, although Taylor did not get to complete its work. But incomplete work and defective work are not synonymous in welding. The Owner's inspector recognized this fact in his July 17, 2016 report: "<u>Findings</u>: Work is still in progress." (Doc. 110, p. 4) (citing Depo. Mafla, Ex. 17, Tay00003). And it is undisputed that he gave Taylor a verbal "pass" for the welds. (Doc. 110, p. 4) (citing McHaney Daily Log).[2]

---

[2] Even the company that finished the work, Champco, provided testimony that its welders would occasionally miss spots: "Q: And do your welders on that second lift, do they go back and check it before they come and get you, or do they just do it one time and then get you to look at it? A: They are supposed to look at it, but sometimes they did and sometimes they didn't. That's kind of why I was the – and extra eye up there. I mean, you stay up there and weld all day long for 12 hours, you miss some things. That's totally understandable. That's why I'd always --- it doesn't hurt to have an extra eye come back and look at that's what I was doing." (Depo. Klug, 35:15-36:1).

Moreover, Taylor directly offered to complete its work, but SLONE ASSOCIATES, INC. ("Slone") denied the offer. (Doc. 110, p. 5) (citing W. Slone Depo.).

Insinuations that Taylor, and not its predecessor, Suwannee Iron Works, is responsible for defective welds is not established by the evidence.  It is undisputed that Taylor devoted significant hours of work correcting Suwannee's welds. (Doc. 110, p. 6).  Also, Defendant is unable to identify even basic information about work it alleges Taylor performed defectively:

> **Interrogatory #3:** Identify with specificity the location of each weld on the Project, including the joist number, that you contend was deficient, as well as: how and when you first became aware of the deficiency in the weld; the companies that performed welding work on that particular joist, the dates those companies performed welding work on the joist, and the factual basis, including inspection reports and witnesses, that support your response; the cost paid to correct the deficient welding on each joist; and, the date Taylor was first notified by you or any subcontractor of the deficiency in the weld, including the means used to provide that notice to Taylor.
>
> **Answer:** Westfield objects to Interrogatory #3 to the extent that it is unclear by including several separated interrogatories in a single request. Westfield is not familiar with the specific work on each joist of the Project. Westfield is not in possession of documents reflecting the work performed.

(Doc. 110-4).  All Defendant can say in response is a conclusory allegation that "Champco had to correct *all* of Taylor's work on the Project." (Doc. 131, p. 11).

Moreover, the case relied upon by Defendant, *Braverman v. Van Bower, Inc.*, 583 So.2d 381 (Fla. 3d DCA 1991), did not hold that a sub-subcontractor on a time-and-materials contract that is denied the right to complete its work is not entitled to a lien. That case held that a contractor hired by an owner materially breached its contract by not obtaining a permit, and thus had not substantially performed. *Id*. at 382.  The facts are different here.  Taylor worked in progress every day to complete its scope under a time-and-materials contract, and had nearly all of its time expressly approved. (Doc. 110-2, Ex. B).  That performance was complete until halted by Daniels and Slone.

Defendant's spoliation of evidence also forecloses this argument. The mystery of whether Taylor or Suwannee performed a weld, and whether such weld is *incomplete* or *defective*, is unsolvable. Slone completely destroyed all the evidence – and did so without giving Taylor notice or a chance to inspect. A fact Defendant does not contest, (*see generally* Doc. 131), and that Taylor established. (Doc. 110, pp. 7, 15-17).

At most, Slone implies it had no duty to preserve evidence of defective welds. (Doc. 131, p. 11). But, Slone still seeks to capitalize on the prejudice it inflicted: "…even if the woeful inadequacy of Taylor's work could be credibly disputed (it cannot be),…" (Doc. 131, p.15).

Reliance on statements by Slone and Klug that Taylor's work had to be totally redone is not substitute for giving Taylor a right to inspect the evidence itself. (Doc. 131, pp. 4-5, 10). Their testimony is patently insufficient – especially where the actual evidence is destroyed. As for Klug, he does not know what company, Taylor, Suwannee, or any other, performed the welds his company completed because those companies were off the job when he arrived. (Depo. Klug, 29:13-23). Moreover, Klug makes it clear that he did not personally inspect the welds on each joist – instead he "bounced around" between up to "three different crews in three different parts of the Wal-Mart." (Depo. Klug, 15:19-23). His role was to "go up there and do a visual inspection" after, not before, his crew would tell him they were done with a joist. (Depo. Klug, 24:2-13). Klug lacks personal knowledge of whether a weld was *incomplete* or *defective*, and whether Taylor or Suwanee did the weld. References to welding done on large phases are too vague to be meaningful, (*see, e.g.,* Doc. 131-4), as Westfield concedes in its interrogatory response. (Doc. 110-4). Therefore, Klug's testimony that "everything" in parts of the Project had to be "repaired" lacks foundation and is too vague to be more than a mere "scintilla" of evidence.

William Slone's testimony cited by Defendant suffers from the same faults. (Doc. 131, p. 4). His only welding training came in high school, he is "not a certified welder," "not someone they would put on a structural job [like this one]", and he is "not classified as a real welder." (Depo. W. Slone, 10:20:11-2). He merely "know[s] enough about welding to know when a weld looked good" and thinks he witnessed a few issues on the job. (Depo. W. Slone, 12:1-9). A person that admits he is not classified as a "real welder" cannot present testimony that a weld is defective – especially without differentiating between *incomplete* or *defective* welds. Moreover, he did *not* witness any of the welding on the Project; and only went "up a couple of times [to] look at the welds." (Depo. W. Slone, 11:7-15). There is simply no foundation for the witness to testify about the quality of Taylor's welding on the Project. Therefore, the witness unquestionably lacks the qualifications, and the factual predicate to offer reliable testimony that would be admissible. This testimony is of no value and should be disregarded.

Therefore, destroying the evidence of the welds by Slone without notice and a chance to inspect wholly deprived Taylor of its right and ability to confront these allegations. Westfield's interrogatory response #3 and admission that it "[fails] to specifically identify which defective welds were done by Taylor", (Doc. 131, p.11), confirms a disturbing reality of this case: *no such evidence can be presented*. As such, a presumption that all of Taylor's work was adequate should be granted, (Doc. 110, pp. 15-17), and summary judgment on this issue granted for Taylor.

As a final matter, Defendant's only argument that Taylor's contractual right to notice-and-cure is inapplicable rests on the fact that Taylor's contract was not with the Defendant. (Doc. 131, pp. 10-11). This argument is misplaced. And Defendant cites no legal authority for it.

Moreover, under Florida lien statutes, the concept of privity is expansive. "The word 'privity' as used in the lien statute, providing for the acquisition of liens by persons in privity

with the owner, against the latter's real property, is not employed in the technical sense of the common law, but implies special knowledge showing active consent or concurrence." *Foley Lumber Co. v. Koester*, 61 So.2d 634, 639 (Fla. 1952). Knowledge and consent is easily established here – where Slone received, reviewed, and approved Taylor's contract giving it *express knowledge* of its terms. (*See* Doc. 110, pp. 3, 15) (*See also* Depo. J. Slone, 51:23-52:4, 54:10-15). This is in accord with the statute itself that grants Taylor a lien "…for any money owed to him or her for labor, services, or materials *furnished in accordance with his or her contract*…" §713.06, Fla. Stat. Taylor has a property interest in its contract that is guarded by the statute. As such, the bonding company, Westfield, and the principal/general contractor, Slone, are not free to deprive Taylor of the benefit of its bargain protected by Section 713.06.

Defendant itself even argues that Taylor's lien rights are set by its contract. (*E.g.* Doc. 131, p. 6) ("Taylor has failed to identify *any* provision of *any* contract or change order with Daniels which authorizes such lodging charges."; "For example, although not authorized by the sub-subcontract, Taylor wrongfully charged $1,1125 for its employees' use of Taylor's trucks…"). Also, its Fourth, Fifth, and Tenth Affirmative Defenses are predicated on lack of compliance with the contract. (Doc. 7, pp. 6-9). Defendant cannot simultaneously argue the contract provides defenses, but does not afford Taylor the protection of its terms. Such arguments run in direct contravention of Section 713.06. Therefore, Taylor's contract, including the notice-and-cure provisions, control the disposition of its lien. (*See* Doc. 110, p. 14).

Additionally, Daniels' speculative "beliefs" are not evidence. Daniels' post-deposition affidavit expressed that Daniels "believed" that "some of Taylor's worker's would not stay for a full twelve (12) hours". (Doc. 131, p.15) (citing para. 15 of the Daniels Aff., filed at (Doc. 128-8)). Defendant relies upon the statements to argue that Daniels "also observed that 'the time

Taylor claimed it worked did not make sense given the lack of progress Taylor was making. Taylor obviously inflated its time.'" (Doc. 131, p. 16) (quoting Daniels Aff., ¶16).

A statement of belief or thought that a time entry does "not make sense" does not create genuine disputed about accuracy of detailed, approved time records. This speculative testimony lacks foundation and is not based on evidence. The purely speculative nature of these *beliefs* was exposed by Daniels' inability to identify a single inaccurate time entry: [3]

> Q:…I think you'll see that there are some time sheets [reviewing Exhibits 17-20 from his deposition of 12/12/18] with names of people that work for Taylor; is that correct?
> A: That's right.
> Q: Can you tell me which of these men you believe left early?
> A: No.
> Q: Why is that?
> A: (No verbal response)
> Q: Just don't recall or –
> A: No. Don't recall.
> Q: Can you tell me at what hours they left?
> A: No.
> Q: What about when they returned?
> A: No.
> Q: Is there any document that you don't have in front of you right now that would help you remember those dates or times or those people?
> A: No.

(Depo. Daniels II, 51:23-52:20). Even if admissible, Daniels' stated belief does not create more than a "scintilla" of evidence sufficient to establish a genuine dispute of fact. Fed. R. Civ. P. 56. Moreover, Taylor's timesheets *deduct* time where less than a full 12-hour shift was worked. (Doc. 110-2, p. 2) (summaries of the hours worked and invoiced in 2nd and 3rd columns). Therefore, there is zero evidence that Daniel's *belief* that Taylor employees left prior to completing a 12-hour shift inflated billed hours. (*See* Doc. 110-2, Exs. A and B) (not billing 12 hours for when employees left the job). Therefore, Defendant's reliance on Daniels'

---

[3] "Q: Prior to today [2/7/19], did you have an opportunity to review your last transcript, from the deposition on December 12th?: A: No." (Depo. Daniels II, 56:22-57:1).

unsupported beliefs is not based on facts that would create a genuine dispute of fact to refute Taylor's detailed time records on summary judgment.

### 2. Billing time for water, rest, or food breaks is not improper

The objection to time for breaks is unfounded. Taylor's contract contemplated that "4. All rates are quoted as straight time," (Doc. 110-3, p. 20), and Taylor billing for breaks was expressly considered by Daniels and Slone *before* executing the contract. (Doc. 110, p.3) (citing Depo. J. Slone, 46:24-47:25, Ex. 2) (e-mail between Slone and Daniels discussing Taylor billing for breaks). In fact, the deposition testimony relied upon by Defendant undercuts this argument:

> Q: Other than this e-mail with the Slone's did you have any other communications with them about charges for breaks by Taylor on this project prior to this lawsuit?
> A: No.
> Q: Did you have any discussions with anybody at Taylor about charges for breaks prior to this lawsuit?
> A: No.
> Q: Was there ever a time when you told Taylor that they could not charge you for water breaks or for food breaks?
> A: I don't recall ever – "

(Depo. Daniels II, 66:18-67:5).[4] Likewise there is no evidence of an amount of time that a person rested, drank, or ate that is allegedly inappropriate. No provision of the Taylor contract required time for breaks to be deducted – and both Daniels and Slone explicitly or implicitly approved of such charges. (Doc. 110-2, Ex. B) (collecting time sheets approved by Daniels).

Justin Slone's testimony is clear that Slone considered Taylor billing for breaks:

> Questions:
>     ….
>
> Is the $60 per hour for time actually spent on the job? Or is travel time charged at this rate? Are lunch and breaks excluded in the time calculations?
>
> Justin might have other questions.
>
> /s/ William Slone

---

[4] This deposition transcript from February 7, 2019 was filed by Defendants at (Doc. 128-2).

(*see* Doc. 110, p. 3) (citing to Depo. J. Slone, 46:24-47:25, Ex. 2 (e-mail from W. Slone to Daniels). Slone is clear that it did *not* object, negotiate, or inform them to exclude breaks. (*See* Depo. J. Slone, 51:10-20). Similarly, Slone agreed that breaks to recuperate during the hot Florida summer are appropriate.[5] (Doc. 110, p. 5 n. 1) (citing Depo. W. Slone, 69:14-70:21).

### 3. Labor rate of $60/hour is contractual and unquestionably valid

Taylor's internal computation of its hourly rate of 60$/hour for labor[6] is immaterial to the enforceability of its lien despite unfounded arguments to the contrary. (Doc. 131, p. 6). Florida law entitles Taylor to lien for the full contractual rate of $60/hour for labor, §713.06(1), Fla. Stat. ("…[a sub-subcontractor] has a lien on the real property improved for any money that is owed to him or her *for labor*, services, or materials *furnished in accordance with his or her contract*…") (emphasis added), even if that labor rate accounted for expenses to Taylor. Moreover, Taylor's contract specified that the labor rates were conclusive: "2. Labor rates [of $60.00] are conclusive and include all overhead and profit." (Doc. 110-3, p. 20). It is telling that Defendant cannot cite a single case holding that a *contractual* labor rate may be invalidated or reduced under Section 713.06(1). (*See* Doc. 131, p. 6).

An unfounded argument that Taylor billed Daniels for lodging charges must be rejected. (Doc. 131, p. 6). The claim is false. The only charges billed to Daniels by Taylor are for time-and-materials under its contract. (*See* Doc. 110-3, pp. 39-42) (itemizing time-and-material costs). To make this strained argument, Defendant misconstrues Greg Taylor's negotiations with Bill Daniels. Those negotiations led to Taylor lowering its normal rate for superintendents of

---

[5] One of Taylor's welders, Mr. Williams, had to quit because the heat and smoke was too intense. (Depo. McHaney, 78:10-15). *See also https://www.osha.gov/SLTC/heatstress/* .
[6] It is uncontested that the $60.00/hour is a labor rate for Taylor's employees – as specified in Taylor's time and material cost sheet provided to Daniels and Slone. (Doc. 110-3, p. 20).

$65/hour plus, but raised its rate for welders from "around $50 per hour" to a uniform rate of $60/hour. (Depo. Taylor, 45:22-46:14).  Although Taylor absolutely – and appropriately – considered enhanced expenses of working "out of town", such as lodging and food, (Depo. Taylor, 44:11-47:13), those considerations do not invalidate the contractual $60/hour rate.  Such an argument has no support in the law.  Moreover, Greg Taylor was absolutely clear that he "*didn't* increase the rate [to account for lodging and other factors]." (*Id.*, 46:15-22) (emphasis added).  Rather, the parties settled on $60/hour, (*id.*, 46:20-47:9), and in doing so Taylor was "keeping in line with our standard, you know, rates, maybe even giving him [Daniels] a little break.  I don't know.  That's just what [rate, $60/hr] we came up with." (*Id.*, 47:11-13); (Doc. 110-3, ¶28) (confirming that the flat rate for labor is common and complete compensation to Taylor for expenses). This objection is baseless.  Therefore, the Court should summarily reject Defendant's attacks on the contractual rate of $60/hour.

### 4. The work invoiced for Taylor's one terminated employee was "Approved"

Only one employee from Taylor's welding crew was terminated for unacceptable work, Tobe Cain. (Depo. McHaney, 77:14-25).  He only worked two twelve (12) hour shifts on July 9 and 10, and for less than two (2) hours on July 11. (Doc. 110-2, p. 7).  On July 11, he was terminated by Taylor, (*id.*), because "[h]is welds was inconsistent". (Depo. McHaney, 77:14-25). Taylor did *not* bill his time for July 11 – and Daniels signed and approved all entries invoiced for those three dates. (Doc. 110-2, p. 15) (approved time sheet for 7/9-11/2016).  Most importantly, there is *no evidence* that the work by Mr. Cain that Daniels approved is *defective* and not lienable.  (*See generally* Doc. 131).

This undisputed testimony shows that this was the *only* incident where Taylor had to go back over a weld. (Depo. McHaney, 79:13-20, 79:24-80:5).  No similar issues arose. (*Id.*)

Therefore, since Daniels explicitly approved Taylor's billing for Mr. Cain these charges are undisputedly appropriate under the Taylor contract and are properly included in the lien.

      b.      <u>Billing for use of a company owned truck is expressly permitted by contract</u>

A minor charge for use of one of Taylor's trucks on the Project has been objected to. The amount of the charge is $1,125.00 for use of "1 truck per day" on the jobsite. (Doc. 131, p.6) (citing Depo. Daniels, 117:13-19). The objection is not to the amount, but that the charge allegedly "was not in our agreement." (Depo. Daniels, 117:18-19). That is incorrect. Taylor's contract states, "4. Company owned *equipment* will be invoiced in accordance with industry standard rental rates.", (Doc. 110-3, p. 20) (emphasis added), and "Trucks" are specifically identified as "EQUIPMENT" on time sheets signed and approved by Bill Daniels. (Doc. 110-3, pp. 29-32) (showing several types of trucks as "equipment" – but not showing this specific charge). Daniels received the invoice billing for "1 truck per day" on August 11, 2016, (Depo. Daniels, Ex. 2, Daniels 00057-58), and accepted it for more than two years without objection. (*Id.* at 119:6-120:5) (he never discussed the invoices with Taylor).

Under Florida law, Bill Daniels' testimony cannot negate Taylor's contractual right to charge for a truck expressly contemplated under its contract. *Peach State Roofing, Inc. v. 2224 South Trail Corp.*, 3 So.3d 442, 445 (Fla. 2d DCA 2009) (reversing trial court for considering a party's testimony to supply an implied term about custom and usage not found in an unambiguous contract); *Madsen, Sapp, Mena, Rodriguez & Co. v. Palm Beach Polo Holdings, Inc.*, 899 So.2d 435, 436 (Fla. 4th DCA 2005) (holding that a party's testimony cannot be considered as parol evidence to limit the fees agreed to under a contract).

Here, Defendant posits no argument that the contract is ambiguous – or explanation as to why the truck is not "Company owned equipment" under Taylor's contract. (*See* Doc. 131, p.6).

Failure to even argue the presence of a contractual ambiguity waives consideration of Daniels' testimony, which is parol evidence, and the Court should refuse to consider this unpresented and undeveloped argument. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) (holding that a party waived arguments on summary judgment by only "stating the elements of the required prima facie showing" because "legal theories and arguments not raised squarely before the district court" are waived on appeal); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). Therefore, the Court should reject the argument that billing for "1 truck per day" is improper under the contract.

## II.     Fraudulent lien affirmative defense is negated and summary judgment is warranted

Throughout its argument Defendant asserts that Taylor's lien is fraudulent. The reasons include that Taylor engaged in "gross negligence when 'reviewing' its lien", (Doc. 131, p.2), and by "willfully and wrongfully" liening for time spent on breaks for food and water, (*id.*, p. 2), time spent on "defective" work, (*id.*, p. 2), and costs for "truck usage" at the Project. (*Id.*, p. 2).

Fraudulent liens are defined by Section 713.31(2), Florida Statutes:

> (2)(a) Any lien asserted under this part in which the lienor has *willfully exaggerated the amount* for which such lien is claimed…or in which the lienor has *compiled his or her claim* with such *willful and gross negligence* as to amount to a willful exaggeration shall be deemed a fraudulent lien.

Yet, "a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due" will not render a lien fraudulent. §713.31(2)(b), Fla. Stat. "Gross Negligence" is "a lack of even slight diligence or care" or "the omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property." Gross Negligence, *Black's Law Dictionary*, (10th ed. 2014). "A 'willful' act is one done intentionally, knowingly, and purposely, without justifiable excuse, as distinguished from an act

done carelessly, thoughtlessly, heedlessly, ignorantly or inadvertently." *Stevens v. Site Developers, Inc.*, 584 So.2d 1064, 1065 n.1 (Fla. 5th DCA 1991). Similarly, "A willfully exaggerated amount is an amount known and intended to be in excess of that allowed by the law under the circumstances and claimed, not in ignorant good faith, but for bad reasons, motives or purposes." *Id.*

### (i) No evidence exists that Taylor *knowingly* billed or liened for defective work

Assuming *arguendo* that some of Taylor's welds were defective[7] – there is no evidence, by testimony or documentation – that Taylor knew of defects when it submitted its invoices to Daniels (and Slone) on and before August 15, 2016, (Doc. 110, p.6), and subsequently filed its lien on August 22, 2016. (*Id.*). All facts point to the contrary. Slone first provided Daniels notice of alleged defects on November 24, 2016. (Doc. 110, p. 7). And Taylor had been denied access to the project after Daniels left. Here, no party contests Taylor's verified statement that "at no time prior to the date that Taylor recorded its lien" did it receive notice that its welds were defective. (Doc. 110-3, ¶¶16, 21). Especially when the ATC inspector verbally passed Taylor's work on July 17, 2016. (*See* Doc. 110, pp. 4, 20-21). Because Taylor lacked notice that its welds were *allegedly* deficient, it cannot be said that it "willfully" billed for hours performing deficient welds. (Doc. 131, p.2) (accusing Taylor of willfully billing for hours doing defective welds). There is no evidence to support this argument. Therefore, absent willfulness or gross negligence there can be no fraud under Section 713.31 and summary judgment is proper.

---

[7] Defendant misrepresents that Taylor does not dispute it performed defective welding: "Remarkably, Taylor does ***not*** dispute that its substandard work had to be corrected." (Doc. 131, p.5); "…Taylor's work was wholly defective and needed to be replaced in its entirety. Taylor does not dispute this." (Doc. 131, p.10). This is not true: "A hotly contested issue is whether Taylor performed shoddy workmanship. Taylor vehemently denies that it did." (Doc. 110, p. 21).

### (ii) Breaks are not *knowingly* improperly included in the lien

Similarly, when Taylor recorded its lien, it had no idea that Daniels or Slone might object to including time for breaks. In fact, as stated earlier, Daniels candidly admits he did not tell Taylor *not* to bill for rest, food, or water breaks. (Depo. Daniels II, 66:18-67:5). Daniels also signed and approved nearly all of Taylor's time, inclusive of time for such breaks during work:

> Q: Is there a reason you didn't sign these [time sheets]?
> A: Because I wouldn't have been there at the closing of the shift.
> Q: So that's a day when you left?
> A: That's right.
> Q: Okay. So Charles – Mickey – Charles was still there.
> A: I had already been there and knew how many people was on the job, and I knew what was going to be the hours for the week, you know, for the night. So I told him it was – he knew it was okay for him to sign off on the timesheet as long as he agreed with the number of men and the number of hours worked.

(Depo. Daniels, 112:18-113:5). There is no *evidence* presented that Taylor *knew* that invoicing for work that included breaks would draw an objection. (*See also* Doc. 110-3, ¶¶30-31) (verify that breaks during 12-hour shifts are proper). Moreover, Bill Daniels personally assured Greg Taylor that Taylor would be paid for all its work on the afternoon of July 25, the last day Taylor billed time, and never recanted the assurance before Taylor filed the lien. (Doc. 110, p. 5). Therefore, Defendant's arguments lack evidence that Taylor knowingly billed for time that had been objected to.

### (iii) A charge for a truck is not a *knowingly* improper charge in this case

Billing for usage of a truck is also alleged as grounds to find Taylor's lien fraudulent. This argument lacks merit. As stated previously, Taylor's contract expressly authorizes billings for company owned equipment, a truck is expressly identified as "equipment" by Taylor in its time sheets signed by Daniels, and Daniels never objected to Taylor's invoice that included a charge for the truck *prior to* Taylor filing its lien. Even accepting *arguendo* that the charge may

be disputable, there is zero evidence provided by Defendant that Taylor willfully included an improper charge. (*See generally* Doc. 131). At best this may be a good faith dispute – but not fraud that would support a claim. §713.31(2)(b), Fla. Stat. (good faith disputes are not fraud). This argument will likewise not thwart summary judgment.

### (iv) Taylor did not compile its lien with gross negligence so as to exaggerated its amount

Defendant argues that "Taylor engaged in gross negligence when 'reviewing' the lien before execution" making the lien fraudulent. (Doc. 131, p.2). Specifically, that typo's in the lien or minor mistakes evidence fraud and invalidate the lien, (Doc. 131, pp. 11-13), and that Taylor's reliance on counsel to prepare the lien is irrelevant. (Doc. 131, pp. 16-21). These arguments are legally and factually unsupported.

Section 713.31, Florida Statutes, states that a lien may be fraudulent where "the *lienor* has *compiled* his or her claim with such willful and gross negligence *as to amount to a willful exaggeration*". §713.31(2)(a), Fla. Stat. (emphasis added). In other words, the pertinent inquiry is how the lienor (not just one person) came to determine the amount of the lien, and whether that process amounted to a "willful exaggeration" of the amount.

Here, the lienor is Taylor the company, not only Greg Taylor. *See* §713.01(17), Fla. Stat. The focus of Section 713.31 is whether Taylor compiled the lien in gross negligence so as to amount to a willful exaggeration. On this point, Defendant's sole factual argument is that Greg Taylor did not sufficiently review the lien before signing it. (Doc. 131, p. 2). But the relevant inquiry starts with Taylor, the lienor, that compiled the lien based strictly on its time-and-materials contract by summing four outstanding (and unobjected to) invoices. (Doc. 110-3, ¶24). To create those invoices, Taylor kept scrupulously detailed time sheets, (Doc. 110-2, Exs. A & B), that no witness has testified contain inaccuracies as to number of men or hours worked. (*See*

*generally* Doc. 131) (Bill Daniels' beliefs and speculations are not admissible or persuasive evidence, as argued earlier.)  Taylor's itemized time sheets were prepared by an experienced, trusted employee for Taylor. (Doc. 110-3, p. 4).  Taylor had nearly all of those time sheets "Approved" in writing by Daniels. (Doc. 110-2, Ex. B).  There is no dispute that the hours on the invoices are the summation of hours on the time sheets, (*see* Doc. 110-2), minus three apparent minor mathematical errors that amount to only 00.521% of the lien. (Doc. 110, p. 9).  The material charges were similarly calculated and included on the invoices, based off of invoices, and receipts from vendors. (*See* Doc. 110, p. 6).  Only one calculation for the materials appears to be off by sum of just $273.37.[8] (Doc. 110, p. 10).  In other words, zero evidence exists that Taylor's compiling of its lien, even with minor computational errors, amounts to the gross negligence needed to support a finding under Section 713.31(2).  That statute states that such errors are insufficient: "…a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due does not constitute a willful exaggeration that operates to defeat an otherwise valid lien." §713.31(2)(b), Fla. Stat.

Neither does finding a minor mathematical error after the deadline to amend a lien under Section 713.08, Florida Statute, invalidate the lien, or render it fraudulent as Defendant argues. (Doc. 131, p. 11).  Authorities relied upon by Taylor, including decisions from this Court, are overwhelmingly persuasive on this point. (Doc. 110, pp. 11-12).

Moreover, to finalize the compiling of the lien, Taylor entrusted the task to its legal counsel who drafted and returned the lien. (Doc. 110, p. 6).  Before signing and recording the lien, Greg Taylor admittedly missed some minor, and harmless typos – but no evidence is

---

[8] Taylor believed this charge, which is hand written with other calculations on one of the time sheets, (Doc. 110-2, p. 18), was for a missing receipt.  After considering Defendant's suggestion that it resulted from calculating a 15% cost-plus charge on one of two bills for electric welders, (Doc. 131, p.9), that calculation seems to explain the discrepancy.  It appears to be a minor mathematical error.

presented that the typos exaggerated the amount of the lien, as required to make it fraudulent under Section 713.31(2)(a).  Neither is there evidence that Taylor knew of these minor typos in time to file an amended lien, (Doc. 131, p. 11), or that stipulating to reductions on summary judgment compels a finding of fraud.

Therefore, there is simply no evidence that Taylor acted with gross negligence in compiling the lien that resulted in an exaggeration in its amount.

**(v) Evidence of advice of counsel to prepare the lien is clear and irrefutable**

Much has been made by Defendant about the drafting of the lien performed by Taylor's counsel. (*See, e.g.,* Doc. 131, pp. 17-21).  "The seeking of advice of counsel, prior to the preparation and filing of the lien, as [lienor] did in this case, is evidence relevant to that [good faith] inquiry." *Stevens*, 584 So.2d at1065.  (Although consultation with counsel is relevant "evidence" – no case in Florida holds that it is an affirmative defense, and Defendant notably cites none in its brief.)

Here, it is undisputed that Taylor contacted its counsel, advised him of the situation on the Project, and provided copies of its invoices and all documents requested, and reasonably relied upon counsel to prepare the lien. (Doc. 110-3, ¶¶22-23).  Defendant's assertion that the only "documented communication between Taylor and its attorney [about preparing the lien] is a single e-mail," (Doc. 131, p. 8), is simply incorrect.  Taylor produced e-mails dated August 15, 18, and 22 of 2016 with its counsel related to the preparation of the lien.[9]  Greg Taylor further testified under cross examination that Taylor "packaged everything up and sent it to the attorney," that counsel was sent "all the stuff" and "everything" related to the lien, although he needed to confirm with his assistant. (Depo. Taylor, 102:4-12, 104:21-105:1).

---

[9] Defendant cites, but apparently inadvertently omitted to include, the August 18, 2016, e-mail. That e-mail is attached as **Exhibit 1**.

Therefore, the arguments that Taylor fails to demonstrate it meaningfully consulted with its counsel that drafted the lien is negated by the evidence presented here.

**III.     Other affirmative defenses are negated and summary judgment is warranted**

As an initial matter, Defendant argues that the legal sufficiency of an affirmative defense may not be challenged on summary judgment under Rule 56 if formerly challenged under Rule 12. (Doc. 132, p. 3).  This argument should be denied as summary judgment is always appropriate to challenge a "claim or defense" under Rule 56; and is what this Court does on may occasion. *Lawton-Davis v. State Farm Mutual Automobile Insurance Co.*, Case No. 6:14-cv-1157-Orl-37GJK, 2015 WL 12839263, *2 (M.D. Fla. Aug. 19, 2015) (denying Rule 12 motion because court could not yet know if claims "insufficient as matter of law," but agreeing that "the Court will reconsider the propriety of Defendant's defenses at the summary judgment stage or at the pretrial conference."); *Seybold v. Clapis*, 966 F.Supp.2d 1312, 1316 (M.D. Fla. 2013) (denying motion to strike but warning that defenses would not survive summary judgment).

Defendant opposes entry of summary judgment on its First, Third, Eighth, and Ninth Affirmative Defenses on the basis that sufficient summary judgment evidence is not cited. (Doc. 132, p. 3); (Doc. 7).  That is incorrect.  Taylor argues that the evidence supporting a finding that it performed under its contract entitles it to judgment on the First Affirmative Defense that it did not fail to mitigate its damages, and that it was not given a chance to avoid monetary losses by fixing deficient welds. (Doc. 110, p.23).  As for the Third Affirmative Defense of unclean hands, Taylor argued that there was no "unscrupulous practices, overreaching" or other conduct, even if Taylor did not fully perform its contract (*id.*); and that the evidence showed that it did perform. (*Id.*)  As for the Eighth and Ninth Affirmative Defense, arguments by Taylor that no negligence

claims were brought, and that unpled defenses by Slone are not "Affirmative Defenses", are unrefuted. (*See* Doc. 132). Therefore, summary judgment on these defenses should be entered.

Similarly, the Second Affirmative Defense of comparative negligence for unspecified conduct (Doc. 7), and the Fourth, Fifth, and Eleventh Affirmative Defenses that Taylor "failed to perform" under its contract with Daniels. (Doc. 7), and the Fourteenth Affirmative Defense seeking set-off for attorney's fees, are fact based arguments previously addressed and opposed on the same grounds – that Taylor failed to sufficiently perform under its contract. (Doc. 132, p. 4-5). For reasons stated earlier, if Taylor is entitled to summary judgment on its lien, then judgment as to these defenses should follow.

Although Defendant concedes that its Sixth Affirmative Defenses is a denial, it argues that summary judgment would not be proper because an earlier motion to strike was denied. (Doc. 132, p. 5). Purported affirmative defenses that are merely denials are properly disposed of on summary judgment. *Eli Research, LLC v. Must Have Info, Inc.*, Case No. 2:13-cv-695-FtM-38CM, 2015 WL 5934632, *4 (M.D. Fla. Oct. 6, 2015) (granting summary judgment on denials framed as affirmative defenses in adherence to *Tingley Systems, Inc. v. Healthlink, Inc.*, 509 F.Supp.2d 1209, 1219-20 (M.D. Fla. 2007)). The holdings in *Eli Research* and *Tingley* compel entry of summary judgment where "defenses" are truly denials.

The Twelfth Affirmative Defense, for "recovery to the extent Taylor has received compensation from other sources," (Doc. 110, p. 25), is defended only on the basis that the only evidence presented is "Taylor's self-serving affidavit" used to show that "it has not received compensation from other funding sources." (Doc. 132, p. 5). The evidence that Taylor is wholly unpaid is thus undisputed, and summary judgment should be granted.

**IV.     The Damages Sought by Slone are Not Recoverable through Set-off**

Although Slone concedes that its recoverable damages are confined by Section 713.31 to the bond premium, attorney's fees and costs, and possibly punitive damages, it incorrectly argues that its fraudulent lien claim can provide other damages via a set-off. (Doc. 131, p. 16).  No legal authority is cited for this novel argument – and such a drastic expansion of the scope of recoverable damages under Section 713.31 is not a matter of discretion.  Therefore, on the issue of damages argued in its motion (Doc. 109, pp. 23-25), Taylor is clearly entitled to at least partial summary judgment against Slone.

**V.     Conclusion**

Wherefore, Taylor respectfully request that this Honorable Court enter summary judgment on all claims as demanded in its motions (Docs. 110 and 109), or in the alternative, partial summary judgment, and grant all relief that is just.

Dated: March 21, 2019          Respectfully Submitted,

/s/ Michael Sasso
MICHAEL C. SASSO, Trial Counsel
Florida Bar No. 368415
msasso@sasso-law.com
MICHAEL A. SASSO
Florida Bar No. 93814
masasso@sasso-law. com
SASSO & SASSO, P.A.
1031 West Morse Blvd., Suite 120
Winter Park, Florida 32789
Tel.: (407) 644-7161
*Attorneys for Taylor Industrial Construction, Inc.*